# Pennsylvania Railroad Co., Appellant, v. Ewing.

*Statutes—Remedial statutes—Violation—Character of penalty—Equity—Equity jurisdiction—Injunction—Police power—Railroad commission.*

1. A statute imposing certain duties upon railroad companies, and declaring that every violation thereof shall be a misdemeanor, and that the guilty party shall be liable to a penalty of $100, "to be recovered with costs as debts are now by law recoverable, by a suit in the name of the Commonwealth, for the use of the county where such violation takes place," and requiring the state railroad commission to enforce the provisions of the act, is not a criminal statute, as no prosecution by indictment can be instituted thereunder, and no fine or imprisonment for the violation thereof is contemplated; such statute is remedial, and the designation of a violation of its provisions as a misdemeanor does not affect its character.

2. A court of equity has jurisdiction of a proceeding by a railroad company to enjoin the state railroad commission from enforcing the provisions of such a statute.

3. A court of equity will not enjoin the enforcing of the provisions of such a statute, where the purpose of the legislature as declared therein is admittedly within the police power of the State, and the means thereby provided for effectuating such purpose appear from the statute to bear a substantial relation to the end to be accomplished.

*Railroad companies—Act of June 19, 1911, P. L. 1053, constitutional law—Deprivation of property—Police power—Interstate commerce—Equal protection of laws—Title of act.*

4. The judiciary can arrest the execution of a statute only when it conflicts with the Constitution, and the courts are not at liberty to declare statutes void because of their apparent injustice or impolicy, or because they appear to the minds of the judges to violate fundamental principles of republican government, unless it should be found that these principles are placed beyond legislative encroachment by the Constitution.

5. Uncompensated obedience to a regulation enacted for the public welfare or safety, under the police power of the State, is not taking property without due compensation, and any injuries sustained in obeying such regulation is but damnum absque injuria, and such requirement is not in violation of the constitu-

tional inhibition against the impairment of the obligation of contracts.

6. When a corporation accepts its charter from the Commonwealth, it does so in subordination to the sovereign police power of the State, to be exercised whenever the safety of the public may call for the exercise of it. The doctrine that grants of franchises are contracts cannot interfere with the exercise of that power.

7. A state is under an obligation to establish such regulations as are necessary or reasonable for the safety of all engaged in business or domiciled within its limits. Local statutes directed to such an end have their source in the power of the State, never surrendered in caring for the public safety of all within its jurisdiction. Undoubtedly, congress in its discretion may take entire charge of the whole subject of the equipment of interstate cars and establish such regulations as are necessary and proper for the protection of those engaged in interstate commerce, but where it has not done so in respect to the number of employees to whom may be committed the actual management of interstate trains of any kind, the statutes of the state, not in their nature arbitrary, and which really relate to the rights and duties of all within the jurisdiction, must control.

8. The purpose of the Act of June 19, 1911, P. L. 1053, as declared in its title, "to promote the safety of travelers and employees upon railroads by compelling common carriers by railroad to properly man their trains" is clearly within the police powers of the State, and the provisions of the act having been found not to be arbitrary and unreasonable, it will not be declared invalid because there might be a conflict of opinion as to the propriety of the legislation.

9. The Act of June 19, 1911, being a valid exercise of police power by the legislature, the fact that railroad companies affected by it must make additional expenditures to comply with its provisions is an immaterial matter so far as the courts are concerned.

10. The title of the Act of June 19, 1911, gives sufficient notice of a provision of the act for the heating of the trains and for means of exit from rear platform and steps, as such a provision is germane to the subject matter of the bill and affects the proper manning of the trains.

11. The Act of June 19, 1911, is not repugnant to the commerce clause of the federal Constitution, as in the absence of congressional regulation of the manning of interstate trains it is competent for the State legislature to provide for the safety of travelers and employees upon such trains while within the State, and

especially where no intention is disclosed in the act of impeding or regulating interstate commerce.

Argued May 5, 1913. Appeal, No. 18, May T., 1912, by plaintiff, from decree of C. P. Dauphin Co., Equity Docket, No. 474; Commonwealth Docket 1911, No. 140; dismissing bill for injunction in case of Pennsylvania Railroad Company v. Nathaniel Ewing, Charles N. Mann and Milton J. Brecht, constituting the Pennsylvania State Railroad Commission. Before FELL, C. J., BROWN, MESTREZAT, POTTER, ELKIN, STEWART and MOSCHZISKER, JJ. Affirmed.

Bill in equity for an injunction to restrain the Pennsylvania State Railroad Commission from enforcing the Act of June 19, 1911, P. L. 1053, known as the "Full Crew Act." Before KUNKEL, P. J., and McCARRELL, J.

Prior to the effective date of the act, this bill in equity was filed in the court below. From the record it appeared that plaintiff complied with the provisions of the act subsequent to its effective date, and in so doing employed additional trainmen on certain of its freight and passenger trains engaged both in intrastate and interstate commerce, and thereby incurred increased expenditures, which aggregated during the period between June 19, 1911, (the effective date of the act) and October 1, 1911, $98,107.31. At this rate it appeared that plaintiff's additional expenses per annum in complying with the act would be $483,907.68.

The court on final hearing held the act constitutional and dismissed the bill. Plaintiff appealed.

*Errors assigned* were various findings of fact and law, and the decree of the court.

*John G. Johnson,* with him *George Stuart Patterson* and *Lyman D. Gilbert,* for appellant.—The exercise of the police power of the State must be reasonable; not

only must the end sought to be attained be within the scope of the power, but the means used must bear some fair relation to that end: Holden v. Hardy, 169 U. S. 366 (18 Sup. Ct. Repr. 383); Yick Wo. v. Hopkins, 118 U. S. 356 (6 Sup. Ct. Repr. 1064); Lake Shore & M. S. Railway Co. v. Ohio, 173 U. S. 285 (19 Sup. Ct. Repr. 465); Lawton v. Steele, 152 U. S. 133 (14 Sup. Ct. Repr. 499); Wisconsin, Etc., R. R. Co. v. Jacobson, 179 U. S. 287 (21 Sup. Ct. Repr. 115); Lake Shore & M. S. Railway Co. v. Smith, 173 U. S. 684 (19 Sup. Ct. Repr. 565); Lochner v. New York, 198 U. S. 45 (25 Sup. Ct. Repr. 539); Atlantic Coast Line R. R. Co. v. North Carolina Corporation Commission, 206 U. S. 1 (27 Sup. Ct. Repr. 585); Toledo, Wabash & Western Ry. Co. v. City of Jacksonville, 67 Ill. 37.

The employment of an additional brakeman on passenger trains as required by the act, bears no relation to the safety of passengers, employees, or the public.

Section 7 of the act is unconstitutional, because it deals with the subject matter which is not expressed in the title, and is contrary to the provisions of article III, section 3, of the Constitution of Pennsylvania.

The cases of Chicago, R. I. & P. Ry. Co. v. Arkansas (86 Arkansas, 412), 219 U. S. 453; and Pitts. C. C., & St. L. Ry. Co. v. Indiana, 172 Ind. 147, are not decisive of the question before this court.

The failure of the act to make any exception in the case of strikes or other unavoidable causes makes the statute a burden upon interstate commerce and therefore an unconstitutional regulation thereof in a matter of national concern: Houston & Texas Central Railroad Company v. Mayes, 201 U. S. 321 (26 Sup. Ct. Repr. 491).

The enormous penalties imposed by the act for the purpose of preventing a resort to the courts to test the validity of the legislation, make the act unconstitutional as a deprivation of property without due process of law, and denies the plaintiff the equal protection of the laws

in violation of the fourteenth amendment to the Constitution of the United States: ex parte Young, 209 U. S. 123 (28 Sup. Ct. Repr. 441); Wilcox v. Consolidated Gas Company, 212 U. S. 19 (29 Sup. Ct. Repr. 192).

A court of equity is not prevented from acting in a case where it would otherwise grant relief, merely because the relief prayed for involves the enjoining of the enforcement of the penalties prescribed by a statute for its violation, such violation being expressly declared a misdemeanor: Mahoning & Shenango Ry. & Light Co. v. New Castle, 233 Pa. 413; Bryan v. Chester, 212 Pa. 259; Penna. R. R. Co. v. Philadelphia County, 220 Pa. 100; P. & R. Ry. Co. v. Philadelphia County, 228 Pa. 505; Reagan v. Farmer's Loan & Trust Co., 154 U. S. 362 (14 Sup. Ct. Repr. 1047); Smyth v. Ames, 169 U. S. 466 (18 Sup. Ct. Repr. 418); Cotting v. Kansas City Stock Yards Co., 183 U. S. 79 (22 Sup. Ct. Repr. 30); Davis & Farnum Mfg. Co. v. Los Angeles, 189 U. S. 207 (23 Sup. Ct. Repr. 498; Dobbins v. Los Angeles, 195 U. S. 223 (25 Sup. Ct. Repr. 18); Ex parte Young, 209 U. S. 123 (28 Sup. Ct. Repr. 441); Herndon v. Chicago, R. I. & P. Ry. Co., 218 U. S. 135; Port of Mobile v. L. & N. R. R. Co., 84 Ala. 115 (4 So. Repr. 106); Platte Canal & Milling Co. v. Lee, 2 Colo. App. 184 (29 Pac. Repr. 1036); Wilkie v. Chicago, 188 Ill. 444 (58 N. E. Repr. 1004); Manhattan Iron Works Co. v. French, 12 Abb. N. C. 446; Mayor, Etc., of Baltimore v. Radecke, 49 Md. 218; Atlanta v. Gate City Gas Light Co., 71 Ga. 106; Austin v. Cemetery Association, 87 Texas 330 (28 S. W. Repr. 528); Rushville v. Rushville Nat. Gas Co., 132 Ind. 575 (28 N. E. Repr. 853); Wesley Church v. Moore, 10 Pa. 273; Kirkpatrick v. M'Donald, 11 Pa. 387; Yard v. Patton, 13 Pa. 278; Philadelphia Ball Club v. Lajoie, 202 Pa. 210; Gray v. Citizens' Gas Co., 206 Pa. 303; Fredericks v. Huber, 180 Pa. 572; Pressed Steel Car Co. v. Standard Steel Car Co., 210 Pa. 464.

*John C. Bell,* Attorney General, and *James Scarlet,* for appellees.

OPINION BY MR. JUSTICE BROWN, June 27, 1913:

The purpose of the bill filed in this case was to enjoin the appellees, constituting the Pennsylvania state railroad commission, from enforcing the provisions of the Act of June 19, 1911, P. L. 1053, commonly known as the "Full Crew Act," on the ground that it is unconstitutional and void. Its constitutionality is challenged for the following alleged reasons: (1) It is not a valid exercise of police power; (2) it violates the provisions in the State Constitution prohibiting the passage of any special law regulating labor; (3) its enforcement will result in no benefit to railroad companies, employees or passengers and, therefore, it violates both Federal and State Constitutions, which alike forbid the taking of property without due process of law; (4) it imposes a burden on interstate commerce; and (5), the penalties for its violation are so enormous and excessive as to intimidate the appellant and other railroad companies from resorting to the courts to test the validity of the legislation. The second reason does not seem to be pressed.

The question of the equitable jurisdiction of the court below, if raised there, was not pressed, and it was not raised here when this appeal was first before us at the October Term, 1912. We, nevertheless, ordered a reargument of our own motion on the single question of equitable jurisdiction, because the injunction prayed for was apparently to enjoin criminal prosecutions for violations of the Act of 1911, the provisions of which the state railroad commission are expressly required to enforce.

While courts of equity deal only with civil and property rights, and are without jurisdiction to interfere by injunction with the administration of criminal justice, this rule is without application in the present case.

True, by Section 8, of the Act of 1911, it is declared that a violation of its provisions shall be a "misdemeanor," but that word is the veriest surplusage, as clearly appears from what immediately follows. A misdemeanor is punishable by indictment resulting from a criminal prosecution, but no such prosecution is contemplated by the Act of 1911. On the contrary, no criminal prosecution can be instituted for a violation of its provisions, for the express remedy for each violation is the imposition of a penalty of $100, "to be recovered with costs as debts are now by law recoverable, by a suit in the name of the Commonwealth, for the use of the county in which such violation takes place." The proceedings which the Act of 1911 authorizes to be instituted for violating it are in the civil courts alone, where the violators are to be made defendants in actions of assumpsit. No criminal prosecution can be instituted against them, even though, by a legislative lapsus linguæ, each violation of the act is declared to be a misdemeanor, for no fine or imprisonment is contemplated by the act, but the mere payment of a certain sum, recoverable as debts are now by law recoverable. Instead of being a penal law, the eighth section of the Act of 1911 is but a remedial one: Taylor v. United States, 3 Howard 197. On the grounds of complaint, as set forth in the bill, the court below clearly had jurisdiction of it: Pennsylvania Railroad Company v. Philadelphia County, 220 Pa. 100; Philadelphia & Reading Railway Company v. Philadelphia County, 228 Pa. 505. In each of these cases the bill was for an injunction to restrain the county of Philadelphia from collecting penalties for violations of the Act of April 5, 1907, P. L. 59, which provided that, for every violation of it, a railroad company should be subject to a penalty of $1,000, payable to the county where the illegal charge was made, and recoverable by said county as debts of like amount were by law recoverable. In the very late case of Herndon v. Chicago, Rock Island & Pacific Railway Company,

218 U. S. 135, the bill filed asked for an injunction against Herndon, prosecuting attorney of Clinton County, Missouri, to enjoin him from attempting to compel payment of the penalties prescribed by an act of the legislature of that state, requiring all railroads operating within it to maintain stations and stop all passenger trains at points of intersection with other railroads. A penalty was provided for noncompliance with the provisions of the act, and it was made the duty of the prosecuting attorney "to prosecute for the recovery of the same." The bill was not only entertained, but the relief prayed for was granted by the court below, whose decree was affirmed by the Supreme Court of the United States. Having no doubt that the case now before us, as presented by the pleadings, was a proper one for equitable jurisdiction, it remains only to state our reasons for sustaining the decree of the court below.

The title to the act under consideration is "An act to promote the safety of travelers and employees upon railroads, by compelling common carriers by railroad to properly man their trains." The declared purpose of the act, as found in its title, is clearly within the police powers of the State, never to be abridged. That power, which extends to all regulations affecting the health, good order, morals, peace and safety of society, includes those which are reasonably necessary for the safety of passengers and employees on railroad trains: Minneapolis & St. Louis Railway Company v. Emmons, 149 U. S. 364. From the face of the Act of 1911 it is most apparent that it has a real, substantial relation to that safety.

From the evidence submitted in the court below it was found as a fact that, while there was an honest difference of opinion as to what was necessary to promote the safety of passengers and employees, the action of the legislature, under all the evidence and circumstances of the case, was not arbitrary and unreasonable. Our review of the evidence has resulted in the same conclusion,

though it is to be remembered that the police power of the legislature is not to be confounded with the policy which it adopts in exercising that power. The matter upon which the legislature acted in 1911—the proper manning of railroad trains for the safety of travelers and employees—being so clearly within its police powers, it is not for courts to interfere with the exercise of that power because judges may hold views inconsistent with the propriety of the legislation. "The scope of judicial inquiry in deciding the question of power is not to be confused with the scope of legislative considerations in dealing with the matter of policy. Whether the enactment is wise or unwise, whether it is based on sound economic theory, whether it is the best means to achieve the desired result, whether, in short, the legislative discretion within its prescribed limits should be exercised in a particular manner, are matters for the judgment of the legislature, and the earnest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance": Chicago, Burlington & Quincy R. R. Co. v. McGuire, 219 U. S. 549.

The wisdom of the legislation of 1911, the necessity for it and the means adopted by the legislature for carrying it into effect were for the legislature alone. Though courts may differ with legislators in their views of public policy, or judges may hold views inconsistent with the propriety of legislation, such divergent views are no ground for judicial interference with valid legislation, and no legislator is compelled to commit any matter involving public health or safety to the final decision of a court or jury: Jacobson v. Massachusetts, 197 U. S. 11; McLean v. Arkansas, 211 U. S. 539. "The protection against unwise and oppressive legislation, within constitutional bounds, is by an appeal to the justice and patriotism of the representatives of the people. If this fail, the people in their sovereign capacity can correct the evil; but courts cannot assume their rights. The judiciary can only arrest the execution of a statute

when it conflicts with the constitution. It cannot run a race of opinions upon points of right, reason, and expediency with the lawmaking power....... If the courts are not at liberty to declare statutes void because of their apparent injustice or impolicy, neither can they do so because they appear to the mind of the judges to violate fundamental principles of republican government, unless it should be found that these principles are placed beyond legislative encroachment by the constitution": Cooley on Constitutional Limitations, ch. 7, sec. 4 (6th Ed. 1890, p. 201). "If the legislature should pass a law in plain, unequivocal and explicit terms within the general scope of their constitutional powers, I know of no authority in this government to pronounce such an act void, merely because, in the opinion of the judicial tribunals, it was contrary to principles of natural justice, for this would be vesting in the court a latitudinarian authority, which might be abused, and would necessarily lead to collisions between the legislative and judicial departments, dangerous to the well being of society, or at least not in harmony with the structure of our ideas of natural government": ROGERS, J., in Commonwealth v. McCloskey, 2 Rawle 369. "It is no part of our business to discuss the wisdom of this legislation. However vicious in principle we might regard it, our plain duty is to enforce it, provided it is not in conflict with the fundamental law": Scowden's App., 96 Pa. 422. "Much of the argument and nearly all of the specific objections advanced, are to the wisdom and propriety and the justice of the act, and the motives supposed to have inspired its passage. With these we have nothing to do, they are beyond our province and are considerations to be addressed solely to the legislature. This court is not authorized to sit as a council of revision to set aside or refuse assent to ill-considered, unwise or dangerous legislation. Our only duty and our only power is to scrutinize the act with reference to its constitutionality,

to discover what if any provision of the Constitution it violates": MITCHELL, J., in Commonwealth v. Moir, 199 Pa. 534.

The Act of 1911 being a valid exercise of police power by the legislature, the fact that railroad companies affected by it must make additional expenditures to comply with its provisions is an immaterial matter so far as courts are concerned. That fact was for the consideration of the legislature alone in determining whether the act should be passed. Uncompensated obedience to a regulation enacted for the public welfare or safety, under the police power of the State, is not taking property without due compensation, and any injury sustained in obeying such a regulation is but damnum absque injuria: New Orleans Gas Light Company v. Drainage Commission of New Orleans, 197 U. S. 453. In an extensive discussion of this subject by Mr. Justice DAY it is said: "There can be no question as to the attitude of this court upon this question, as it has been uniformly held that the right to exercise the police power is a continuing one; that it cannot be contracted away, and that a requirement that a company or individual comply with reasonable police regulations without compensation is the legitimate exercise of the power and not in violation of the constitutional inhibition against the impairment of the obligation of contracts. ......The principle was recognized and enforced in Chicago, Burlington & Quincy R. R. Co. v. Chicago, 166 U. S. 226, where it was held that the expenses incurred by the railroad company in erecting gates, planking at crossings, etc., and the maintenance thereof, in order that the road might be safely operated, must be deemed to have been taken into account when the company accepted its franchise from the state, and the expenses incurred by the railroad company, though upon new streets, might be required as essential to the public safety. In Detroit, Ft. W. & B. I. Ry. Co. v. Osborn, 189 U. S. 383, it was held that the State of Michigan

might compel a street railroad to install safety appliances at an expense to be divided with a steam railroad company occupying the same street, notwithstanding the steam railroad was the junior occupier of the street. The subject was further under consideration in New Orleans Gas Light Co. v. Drainage Commission of New Orleans, 197 U. S. 453, where it was held, that although the gas company had permission from the city to lay its pipes under the streets, it might be required to remove the same at its own expense, in the exercise of the police power in the interests of the public, in order to make way for a system of drainage which was required, in the interest of the public health, without compensation to the gas company; and that uncompensated obedience to regulations for public safety under the police power of the state was not a taking of property without due process of law....... The result of these cases is to establish the doctrine of this court to be that the exercise of the police power in the interest of public health and safety is to be maintained unhampered by contracts in private interests, and that uncompensated obedience to laws passed in its exercise is not violative of property rights protected by the Federal Constitution": Northern Pacific Ry. Co. v. Minnesota, ex rel. Duluth, 208 U. S. 583.

Nothing is to be found in the body of the Act of 1911 of which its title does not fairly give clear notice. As to the alleged unconstitutionality of the seventh section, because "it refers exclusively to the equipment of cars, and not to the proper manning thereof, the title disclosing no other purpose than to promote safety by properly manning trains," a sufficient answer is found in what the court below said in declining to affirm the plaintiff's tenth request for a legal conclusion: "We cannot say that the seventh section is unconstitutional for the reasons stated in this point. The seventh section relates to trains composed of United States mail and express cars, upon which are carried in addition to the trainmen,

postal clerks and express messengers, who are compelled to be travelers upon such trains. The legislature doubtless had in mind the fact that such trains have very small, if any, platforms between the cars, so that there may be, for express and mail purposes, free communication between the cars carried in such trains, and in order that such trains may be properly manned and protected by the trainmen, provision has been made for the heating of the trains and for means of exit from a rear platform and steps, so that trainmen may perform their duties of getting off the train to examine the running gear and other appliances of the cars, and give necessary signals in case the train is required to stop. Without some way of getting from the car to the ground, a trainman could not perform all his duties, and the train would not be properly manned. The section is in our opinion germane to the subject matter of the bill and is not unconstitutional for the reason stated in this request."

After having given due consideration to the various reasons assigned for asking that the Act of 1911 be struck down, we feel that no one of them calls for such a disposition of it. Two similar statutes, passed by the legislatures of Arkansas and Indiana, have been upheld, not only by the courts of last resort in those states, but by the Supreme Court of the United States, in the face of the same objections made to them as appellant makes to the Act of 1911: Chicago, Rock Island & Pacific Railway Company v. Arkansas, 219 U. S. 453; Pittsburgh, C., C. & St. L. Ry. Co. v. State (172 Indiana 147), 87 N. E. Repr. 1034. In the first case, Mr. Justice HARLAN, after referring to numerous cases sustaining the judgment of the Supreme Court of Arkansas, proceeded to say: "The principles announced in the above cases require an affirmance of the judgment of the Supreme Court of Arkansas. It is not too much to say that the state was under an obligation to establish such regulations as were necessary or reasonable for the safety of

all engaged in business or domiciled within its limits. Beyond doubt, passengers on interstate carriers while within Arkansas are as fully entitled to the benefits of valid local laws enacted for the public safety as are citizens of the state. Local statutes directed to such an end have their source in the power of the state, never surrendered, of caring for the public safety of all within its jurisdiction; and the validity under the Constitution of the United States of such statutes is not to be questioned in a federal court unless they are clearly inconsistent with some power granted to the general government or with some right secured by that instrument or unless they are purely arbitrary in their nature. The statute here involved is not in any proper sense a regulation of interstate commerce nor does it deny the equal protection of the laws. Upon its face, it must be taken as not directed against interstate commerce, but as having been enacted in aid, not in obstruction, of such commerce and for the protection of those engaged in such commerce. Under the evidence, there is admittedly some room for controversy as to whether the statute is or was necessary; but it cannot be said that it is so unreasonable as to justify the court in adjudging that it is merely an arbitrary exercise of power and not germane to the objects which evidently the state legislature had in view. It is a means employed by the state to accomplish an object which it is entitled to accomplish, and such means, even if deemed unwise, are not to be condemned or disregarded by the courts, if they have a real relation to that object. And the statute being applicable alike to all belonging to the same class, there is no basis for the contention that there has been a denial of the equal protection of the laws. Undoubtedly, congress in its discretion, may take entire charge of the whole subject of the equipment of interstate cars, and establish such regulations as are necessary and proper for the protection of those engaged in interstate commerce. But it has not done so in respect of the number of em-

ployees to whom may be committed the actual management of interstate trains of any kind. It has not established any regulations on that subject, and until it does the statutes of the state, not in their nature arbitrary, and which really relate to the rights and duties of all within the jurisdiction, must control. This principle has been firmly established, and is a most wholesome one under our systems of government, federal and state."

When the appellant accepted its franchises from the Commonwealth, it did so in subordination to the sovereign police power of the State, to be exercised whenever the safety of the public might call for the exercise of it. No doctrine that grants of franchises are contracts, can interfere with the exercise of that power, for salus populi, suprema lex. The chief franchise of the appellant is the right or privilege to carry passengers or freight for pay, and the safety of the former and of employees needed in the operation of trains means at all times the safety of multitudes of people committed to the care of the appellant under its franchises. To provide for safety to these multitudes is the sole and avowed purpose of the Act of 1911. The legislature was not only empowered to pass it, but was charged with the duty of enacting it, if the safety of those within the contemplation of the act required it. That was a purely legislative question, with which courts can no more interfere than they can with reasonable means adopted by the legislature to secure the needed safety. It is not needful that we say anything more in affirming the decree of the lower court.

Appeal dismissed at the costs of appellant.

CONCURRING OPINION BY MR. JUSTICE STEWART:

I was of opinion, until now that it has been decided otherwise, that the appellant's bill should have been dismissed for want of jurisdiction in the court. In forming this opinion I had regard to an established rule, universally recognized, that courts of equity deal only with

civil and never with criminal matters, except as these latter are incidentally involved in a controversy which in itself is a proper subject of equity jurisdiction. I assumed the criminal character of the statute, the constitutionality of which is here assailed, because in express terms it makes any violation of its provisions a misdemeanor, punishable by fine. The fact that such violation was not made punishable by indictment, I thought unimportant in this connection, because of the clear distinction in law between misdemeanors which are mala in se and necessarily punishable indictment, and misdemeanors mala prohibita which are only punishable in the way provided by statute, but which are misdemeanors none the less. (See Wharton's American Criminal Law, Sec. 10.) It never occurred to me that in making violation of the statute a misdemeanor, the legislature indulged in surplusage, or that its meaning was beclouded by a lapsus linguæ. While the act of assembly here in question, out of consideration of public safety, imposes on railroad companies the duty of safeguarding their trains in a prescribed manner which may and doubtless will require much additional expenditure on their part in the operation of their roads, I failed to see in this any invasion of property rights. So far as this question was involved, I could not distinguish between this legislation and the many acts passed in the exercise of police power which require, alike of corporations and private individuals, that at their own expense, for the protection of the public, they supply certain prescribed means of escape from buildings in case of fire, and certain prescribed guards upon and about dangerous machinery which they employ in the business of manufacturing, except that compliance with this law would require larger expenditure than compliance with those referred to. The difference is purely relative; and I felt that if such circumstance was to govern, it would follow that there was one law and one method of procedure for the individual or corpora-

tion engaged in extensive business operations and quite another for the individual or corporation conducting business within narrower limits, a result so opposed to the common conception of distributive justice that I gave the exception no consideration. If property rights are invaded by the act under consideration, they are quite as directly invaded by our factory laws and our fire escape laws; so it seemed to me, and I felt little doubt that a bill presented by an individual operating a circular saw in a modest planing shop to test the constitutionality of the law that required him to place a guard about his saw would be dismissed, with a reminder to the petitioner that a court of law was the proper tribunal to dispose of such a question.

Nor could I see that the fines and penalties imposed for violation of the law were so severe as to prevent or obstruct resort to the courts of law for the purpose of testing the validity of the act. Where the fines and penalties are so excessive as to preclude such resort, equity jurisdiction may be invoked; but I could not understand how a fine of $50 for each violation, which would be quite enough to bring the offending party into a common law court, could be a deterrent.

But my view was not that of the court, and the bill was heard on its merits. In the conclusion reached on the constitutionality of the act I concur. On the other question, since we have reached the end of controversy, I yield to the views of my brethren, and therefore join in the decree entered.