MISSISSIPPI STATE TAX COMMISSION *v.* FLORA DRUG CO.

(En Banc.  May 22, 1933.)

[148 So. 373.  No. 30401.]

(1)

Walter Sillers, Jr., of Rosedale, for appellant.

6.

W. E. Gore and W. S. Thompson, Jr., both of Jackson, for appellant.

**W. W. Pierce**, Assistant Attorney-General, for appellant.

Stevens & Heidelberg, of Hattiesburg, and **R. H. & J. H. Thompson**, of Jackson, for appellee.

Argued orally by **W. E. Gore** and **W. W. Pierce**, for appellant, and by **J. H. Thompson** and **R. W. Heidelberg**, for appellee.

**Ethridge, J.,** delivered the opinion of the court.

The appellee, a duly licensed retail drug dealer, engaged in selling drugs, sundries, cigars, cigarettes, smoking tobacco, and tobacco products, filed a petition in the circuit court in the first district of Hinds county, Mississippi, against the state tax commission and the members thereof, seeking to compel the commission, by mandamus, to sell said dealer stamps as required by chapter 92, Laws of 1932, alleging that sections 3, 5, and 6 of said chapter are unconstitutional for various reasons, and, if enforced, would operate to destroy a lucrative business.

Counsel for appellee, the Flora Drug Company, summarizes its contentions as follows:

(1) "The provisions of section 6 deprive appellee of its property without due process of law, in violation of the Fourteenth Amendment to the Federal Constitution,

16

and section 14 of the Mississippi Constitution, because: (a) The enforcement thereof will prevent appellee from engaging in the business of selling its cigars and carrying on its lawful business; (b) The requirement by section 6 that appellee shall take its cigars to the nearest wholesaler for stamping is unreasonable, unnecessary and arbitrary; (c) The requirement that only wholesalers may purchase and affix the stamps, and that retailers who purchase tobacco from wholesalers who do not hold a permit must, within forty-eight hours, carry them to the nearest wholesaler holding such permit, to have stamps affixed, is not only unreasonable, arbitrary, burdensome and oppressive to appellee, but is not reasonably necessary to the object sought to be accomplished by the legislation."

(2) "The provisions of section 6 deny unto appellee the equal protection of the laws, as guaranteed by the Fourteenth Amendment to the Federal Constitution, because, (a) The provisions of section 6 do not operate fairly, equally and uniformly upon all property of the same class and description, nor do they apply impartially as between appellee and other retail dealers in the same class; (b) The provisions of section 6 impose a tax upon false and unjust principles, and operate to cause inequality and discrimination as between retail tobacco dealers of the same class, character and description."

(3) "The provisions of section 6 are violative of the commerce clause of the Federal Constitution, because, (a) They create an illiberal and unjust restraint upon commerce and trade between the states, and thus impose a burden on interstate commerce; (b) The regulatory provisions of section 6, requiring the retailer who purchases unstamped tobacco in interstate commerce to carry same to the nearest wholesale dealer holding a permit, as applied to the appellee, effectually prevents appellee from purchasing such goods in interstate commerce; (c) The provisions of section 6 are discrimina-

tive and burdensome to such a degree as to impair the right of appellee, a citizen of Mississippi, to move his property into the state.''

The provisions of the statute challenged in this lawsuit require every person engaged in the business of purchasing, selling, or distributing tobacco in this state to file with the commissioner an application for a permit allowing him to engage in such business, within thirty days after the passage of the act, and that such permit shall be displayed at all times in some conspicuous place at or near his place of business, and, if a transient vendor, he shall have such permit in his possession. Section 5 of the act provides that any person engaged in such business without such permit shall be guilty of a misdemeanor. Section 6 of the act complained of reads as follows:

''There is hereby imposed, levied and assessed to be collected and paid as hereinafter provided in this act, an excise or privilege tax on each dealer in tobacco, as herein defined, computed at the rate of one cent for each five cents, or fractional part thereof of the retail selling price, which tax shall be paid in the following manner: Every wholesaler shall purchase stamps as herein provided and affix the same to all tobacco handled by him as herein provided. Any retailer who shall receive any tobacco otherwise than from a wholesaler having a permit as herein provided, shall, after the receipt of such tobacco, within the time limit herein provided, present the same to some wholesaler having such permit for the affixing of the stamps required, and it shall be the duty of such wholesaler, thereupon and upon the payment to him by such retailer of the face value of the stamps required, to affix said stamps to said tobacco in the same manner as if said tobacco were handled and sold by said wholesaler, provided, that in the event any wholesaler within this state refuses to affix the stamps on any tobacco upon the request of any retailer, as herein pro-

vided, said wholesaler shall forfeit to the state a penalty of twenty-five dollars for each offense, same to be collected as provided by law for the collection of other penalties, and in addition thereto, in the discretion of the court forfeit his permit to handle the stamps herein provided for. And in event of such refusal on the part of any wholesaler to affix the stamps upon the request of any retailer, said retailer may make application to the commissioner for stamps to be placed on the tobacco upon which the wholesaler refused to affix the stamps, said application to be accompanied with an affidavit of the retailer or some other credible person, setting forth the facts, whereupon the commissioner may issue and sell to such retailer a sufficient number of stamps to be affixed to the tobacco upon which such wholesaler refused to affix the stamps. Stamps shall not be affixed to any tobacco, as herein provided, except by wholesalers having permits, except as hereinabove provided, and any wholesaler or manufacturer within or without this state may, upon application, be entitled to receive such permit and shall thereupon be authorized to purchase the stamps, and affix the same to tobacco, as herein provided. Stamps shall not be required by this act to be affixed to any tobacco while the same is in interstate commerce. In no case shall the provisions of this act be construed to require the payment of a tax upon any tobacco upon which the tax herein levied has once been paid to the state.''

Section 7 of the act provides that, if any clause or part of section 3 shall be declared invalid, then all of said sections 5 and 6 shall be invalid, and sections 8, 9, and 10 following shall apply in lieu thereof.

The principal challenge is, as we conceive it, that said act is in violation of the due process clause of the state and Federal Constitutions (Mississippi, 1890, section 14; U. S. Amend. 14), in that it imposes an arbitrary and unreasonable restriction upon a lawful business. However, there are other grounds to be noticed.

It is one of the most important and necessary functions of government that taxes be raised for the purpose of maintaining the government, and the Legislature is granted a wide field in choosing the subjects of taxation and in providing methods and a system of collecting them.

If a statute has a reasonable relation to a governmental purpose, and is calculated to carry out some governmental design, the courts cannot strike it down as being arbitrary, although members of such courts might think the system was inconvenient, and that a better system could be devised. Statutes cannot be declared void merely because they are inconvenient and burdensome, if they are calculated to further governmental purposes.

In volume 1, section 65, Sutherland on Statutory Construction (2 Ed.), it is said that: "Statutes cannot be declared invalid on the ground that they are unwise, unjust, unreasonable or immoral, or because opposed to public policy, or the spirit of the Constitution."

In 1 Cooley's Constitutional Limitations (8 Ed.), at page 345, that learned author says that: "The moment a court ventures to substitute its own judgment for that of the Legislature, in any case where the Constitution has vested the Legislature with power over the subject, that moment it enters upon a field where it is impossible to set limits to its authority, and where its discretion alone will measure the extent of its interference. The rule of law upon this subject appears to be, that, except where the Constitution has imposed limits upon the legislative power, it must be considered as practically absolute, whether it operate according to natural justice or not in any particular case. The courts are not the guardians of the rights of the people of the state, except as those rights are secured by some constitutional provision which comes within the judicial cognizance. The protection against unwise or oppressive legislation, within constitutional bounds is by an appeal to the justice

and patriotism of the representatives of the people. If this fail, the people in their sovereign capacity can correct the evil, but courts cannot assume their rights. The judiciary can only arrest the execution of a statute when it conflicts with the Constitution. It cannot run a race of opinions upon points of right, reason and expediency with the law-making power, nor can it consider the motive which inspired the passage of a statute in determining the question of its validity.'' In note 1 to this quotation it is said that: ''If the Legislature should pass a law in plain and unequivocal language within the general scope of their constitutional powers, I know of no authority in this government to pronounce such an act void, merely because, in the opinion of the judicial tribunals, it was contrary to the principles of natural justice; for this would be vesting in the court a latitudinarian authority which might be abused, and would necessarily lead to collisions between the legislative and judicial departments, dangerous to the well being of society, or, at least, not in harmony with the structure of our ideas of natural government. . . . All the courts can do with odious statutes is to chasen their hardness by construction. Such is the imperfection of the best human institutions, that, mould them as we may, a large discretion must, at last, be reposed somewhere. The best and in many cases the only security is in the wisdom and integrity of public servants, and their identity with the people. Governments cannot be administered without committing powers in trust and confidence,'' citing authorities. On page 351 of this same work it is said that: ''Nor are the courts at liberty to declare an Act void, because in their opinion it is opposed to a spirit supposed to pervade the Constitution, but not expressed in words. 'When the fundamental law has not limited, either in terms or by necessary implication, the general powers conferred upon the legislature, we cannot declare a limitation under the notion of having discovered something

in the spirit of the Constitution which is not even mentioned in the instrument.' ''

In passing upon an act of the Legislature to promote the public interest, we must allow a wide latitude, remembering that members of the Legislature may be more familiar with the situations and conditions. The Legislature has the power to make investigations and to give painstaking consideration to the results thereof. One of the attorneys for the appellant, an experienced member of the Legislature and chairman of the judiciary committee of the House of Representatives, in his brief, sets forth the conditions which confronted the legislative department at the time this act was passed. He says, in substance, that the law imposing stamps to be placed on all tobacco was first enacted in 1930 (Laws 1930, chapter 90, article 3); that the necessity for increased revenue, on the one hand, and the expenditures of government, on the other, was serious; that the state was facing a deficit, and the current revenues were not sufficient to pay the expenses of government; that many forms of taxation were enacted by the Legislature, including privilege taxes on the sale of tobacco; that most of these revenue raising acts were utterly inadequate; and that no increase in ordinary taxation would meet the situation that faced the Legislature. He further states that under the 1930 law retailers engaged in the sale of tobacco were required to affix stamps to tobacco; that there were approximately eleven thousand retail tobacco merchants in Mississippi, as against only one hundred or one hundred fifty wholesalers; that the enforcement of this tobacco tax was given to the state tax commission, which was authorized to make rules and regulations to enforce same; that the Legislature obtained from the Department of Commerce of the United States government the proximate amount of cigars sold in Mississippi, and that the amount collected, as estimated by the Legislature, would be seven hundred fifty thousand dollars to eight hundred thousand.

dollars per annum. But, when the law of 1930 was actually put into effect, the revenue from this source was so much less than was anticipated as to indicate that about fifty per cent. only of the estimated amount was collected; and that there was a substantial increase under the present law. He further states that, upon inquiry as to the cause of this condition, it was learned that the retailers, in many instances, were not complying with the law, and were selling tobacco and its products without first affixing the stamps thereto, thus depriving the state of its revenue from such sales; that the law was fast falling into contempt before the public generally, and that, when the Legislature met in 1932, its problem was far more difficult than that of the 1930 Legislature, being faced with unpaid warrants and a deficit of more than twelve million dollars; that the Tobacco Tax Law of 1932 was enacted, and produced, to January 1, 1933, the sum of seven hundred seventy-eight thousand eight hundred six dollars and sixteen cents, as against seven hundred fifty thousand dollars the estimated revenue for that period, and as compared with the sum of three hundred twenty-six thousand three hundred seventy-seven dollars collected from this source from October 1, 1931, to October 1, 1932, as shown by the auditor's report. He further says that: "When the Legislature was considering the 1932 Tobacco Tax Law, they found that the cause of its failure to produce the reasonable revenue estimated therefrom was that the retailers looked with contempt on the law and were guilty of flagrant violations thereof, and it set about to find ways and means to prevent these violations. If a sufficient force were employed to inspect each retail establishment at such frequent intervals as to be able to detect the violations it would require a hoard of tax inspectors at an expense so enormous it would cost nearly or as much as the amount of the tax, therefore, it was deemed by the Legislature that the most effective way to enforce the provisions of the act

and reduce to a minimum its violations was to close the door of opportunity to those practicing the fraud, and place the handling of the stamps in as few hands as possible, thus making the act easier of enforcement and reducing the expense thereof to a minimum. This was accomplished by the enactment of chapter 92 of the Laws of 1932 classifying the dealers in cigarettes, cigars and smoking tobacco into two classes, to-wit, wholesalers and retailers, a reasonable classification perfectly valid and constitutional. Under the act permits for the handling of stamps and affixing them to tobacco was vested in the wholesalers, and the act also required retailers to make application to wholesalers to have their tobacco stamped. This amendment providing for the classification of the wholesalers and retailers was made necessary, not only for the purpose of making sure the collection of the revenue to be derived from this source and a proper enforcement of the law, but was to protect the honest retailers who were subjected to the unfair competition of those who were defrauding the state and engaged in the 'bootlegging' of tobacco. That the system adopted by the Legislature is wise and makes the enforcement of the law easy and certain is attested by the results achieved. The law is now functioning smoothly and effectively, and it is a matter of common knowledge that it is meeting with almost universal approval by the wholesalers and retailers, and the results as a revenue producer have been highly satisfactory.''

Giving due weight to this and other considerations that may have influenced the Legislature in enacting the law, can it be said that the act is unreasonable and arbitrary, and without a legitimate basis of classification? We think not, and that courts cannot substitute their judgment for that of the Legislature, and strike down an act, because, in the opinion of the court, it is unwise or oppressive. See the following cases: McCray v. U. S., 195 U. S. 27, 24 S. Ct. 769, 49 L. Ed. 78, 1 Ann. Cas. 561;

Richardson v. McChesney, 128 Ky. 363, 108 So. W. 322, 129 Am. St. Rep. 299; Ex parte Kair, 28 Nev. 127, 80 Pac. 463, 113 Am. St. Rep. 817, 6 Ann. Cas. 893; Pennsylvania R. Co. v. Ewing, 241 Pa. 581, 88 App. 775, 49 L. R. A. (N. S.) 977, Ann. Cas. 1915B, 157; Mutual Loan Co. v. Martell, 222 U. S. 225, 32 S. Ct. 74, 56 L. Ed. 175, Ann. Cas. 1913B, 529.

The mode of enforcing the payment of taxes is entirely within the control of the Legislature. Witherspoon v. Duncan, 4 Wall. 210, 18 L. Ed. 339.

A tax may be collected in any way suited to the necessities of each case. Tappan v. Merchants' Nat. Bank, 19 Wall. 490, 22 L. Ed. 189. Uniformity of taxation does not require uniformity of collection, but only uniformity of assessment. Tappan v. Merchants' Nat. Bank, supra.

The complaint in the case at bar is largely that a retail dealer cannot buy stamps to put upon his goods, and that to comply with the statute and carry his goods to a wholesaler to have stamps affixed is highly inconvenient. The appellee here purchased certain goods in St. Louis, cigars advertised to be sold for five cents each, and contends that to require him to bring these to a wholesaler such a distance would be so expensive as to deprive him of any profit, and that there is no reason why the state should require him to carry these goods to a wholesaler to be stamped.

As stated by the member of the Legislature from whose brief we have quoted, experience had demonstrated that the retailers would not comply with the law, and that the expense of checking up against the large number of retailers was so great as to practically absorb the revenue. A large number of wholesalers in the state have permits and stamps which they will affix to goods purchased from them, and also to goods purchased elsewhere, and we think it is within the power of the Legislature to require that wholesalers must affix stamps to all goods presented to them. If a retailer did not com-

ply with the Law of 1930, how can we, or the Legislature, assume he will comply with the present law? It must be remembered that, in dealing with this subject, under modern conditions, goods may be brought into the state by trucks, in very large quantities, more than in former years, and the state has been unable to check against goods so brought into the state and to determine whether taxes have been paid by the retailers. Under the old system, merchandise was sent by express or freight, and records of the amount, value, etc., were kept, which records formed a criteria by which the amount of tax could be determined; but, with improved highways leading into the state from many directions, great quantities of merchandise may be brought from New Orleans, Mobile, Birmingham, Memphis, and other places, and all of these improved highways afford facilities for "bootlegging" merchandise to avoid paying the taxes.

There is nothing in section 6 of chapter 92, Laws of 1932, to prevent a wholesaler located outside of the state of Mississippi from bringing goods purchased from such wholesaler into the state. Indeed, he is given the privilege so to do, and the privilege of acquiring a permit and stamps to be affixed to goods of retail dealers; but he is not required to do this or keep such stamps. It would be beyond the power of the state to compel them to do so, but they are permitted to, and there is nothing in the situation to warrant us in believing that they will not use this method when dealing with Mississipi retail merchants. By the express terms of section 6, the stamp tax does not apply to interstate shipments. In other words, goods can be ordered and delivered in the state of Mississippi without any stamps being placed thereon until the interstate transaction is ended. Where a party orders cigars for his own use, and not for sale, no stamps need be affixed.

We cannot say, under modern conditions, that this act would impose any great burden upon retailers—the bur-

den of carrying their tobacco to some wholesaler to be stamped; but there is nothing to prevent a wholesaler outside the state of Mississippi from rendering their customers the service of keeping stamps and furnishing them to be affixed to merchandise sold, or from sending them to some resident wholesaler, or from establishing an office at a convenient point in the state to comply with the law. The mere fact that this may impose some burden, as shown by authorities cited, does not avoid the legality of the system.

It is manifest from the history of the transaction that the system adopted by the Legislature has increased the state's revenues, and has aided the state in carrying out its policies of collecting the stamp tax upon such articles. The most that can be said of the transaction is that it is less convenient to some retailers than the former system, but this is answered by the fact that it is reasonable, and is an efficient cause of the state's gain in revenue, which could not be claimed under the old scheme, and, whenever a scheme devised affords a reasonable facility to the state in carrying out some agency or purpose, we cannot say it is arbitrary.

A number of states have adopted statutes requiring national banks to collect taxes from shareholders, and the United States Supreme Court has held this to be permissible, and that such requirement does not violate the Fourteenth Amendment. In Merchants' Bank v. Pennsylvania, 167 U. S. 461, 17 S. Ct. 829, 42 L. Ed. 236, it was held that a statute requiring national banks to collect taxes from its shareholders without requiring state banks to do the same is not a discrimination against national banks prohibited by federal statutes, because of the possibility that some shareholders in the state bank may escape taxation.

In Beers v. Glynn, 211 U. S. 477, 29 S. Ct. 186, 53 L. Ed. 290, it was held that the power of the states in respect to taxation is very broad, so far as the Federal Con-

stitution is concerned. It may be laid down as a general rule that mere inequalities or exemptions in the matter of state taxation are not forbidden by the Federal Constitution.

In Bell's Gap R. Co. v. Pennsylvania, 134 U. S. 232, 10 S. Ct. 533, 33 L. Ed. 892, it was held that the equal protection clause of the Federal Constitution does not prevent a state from adjusting its system of taxation in a reasonable manner, nor compel the state to adopt an ironclad rule of equal taxation. It is pointed out in this case that a wide latitude is given in adjusting taxes.

In Giozza v. Tiernan, 148 U. S. 657, 13 S. Ct. 721, 37 L. Ed. 599, and Branson v. Bush, 251 U. S. 182, 40 S. Ct. 113, 64 L. Ed. 215, it was held that the power of the state to classify property for the purpose of taxation is large. It is enough that there is no discrimination in favor of one as against another of the same class.

When we consider the complaints made in the present argument that the statute operates harder upon the retailer living at a distance from a wholesaler than upon one living nearby, we will find it is more an incident of location of business and not a transaction involving a principle of law. A man who sells merchandise away from commercial centers is more inconvenienced than one who is more favorably situated, but each must conform to the statutory way of doing things. It is true that a man who lives twenty-five miles from a wholesale house, and buys from a wholesaler outside the state, must transport his merchandise to the nearest wholesaler within the state before he is ready for business. That is no discrimination against him. He can meet the competition in his own town because the others are subject to the same conditions he is subject to.

In Quong Wing v. Kirkendall, 223 U. S. 59, 32 S. Ct. 192, 56 L. Ed. 350, it was held that a state does not deny the equal protection of the law merely by adjusting its revenue laws and taxing system in such way as to favor

certain industries or forms of industry. In this case it was pointed out in 223 U. S. 59, 32 S. Ct. 192, 193, 56 L. Ed. 350, that: "A state does not deny the equal protection of the laws merely by adjusting its revenue laws and taxing system in such a way as to favor certain industries or forms of industry. Like the United States, although with more restriction and in less degree, a state may carry out a policy, even a policy with which we might disagree. [Citing authorities.] It may make discriminations, if founded on distinctions that we cannot pronounce unreasonable and purely arbitrary, as was illustrated in American Sugar Ref. Co. v. Louisiana, 179 U. S. 89, 92, 95, 45 L. Ed. 102, 103, 105, 21 S. Ct. 43; Williams v. Fears, 179 U. S. 270, 276, 45 L. Ed. 186, 189, 21 S. Ct. 128; W. W. Cargill Co. v. Minnesota, 180 U. S. 452, 469, 45 L. Ed. 619, 627, 21 S. Ct. 423. It may favor or discourage the liquor traffic or trusts."

There are many cases which illustrate the power to levy taxes, and furnish a scheme for their assessment and collection, which show that the constitutional provisions are elastic, and that the states may adopt a reasonable and effective system, although it may impose hardships, or may impose some individual inequalities. See U. S. L. Ed. Digest, "Constitutional Law," section 584; Ohio River & W. R. Co. v. Dittey, 232 U. S. 576, 34 S. Ct. 372, 58 L. Ed. 737; Brushaber v. U. P. R. R. Co., 240 U. S. 1, 36 S. Ct. 236, 60 L. Ed. 493, L. R. A. 1917D, 414, Ann. Cas. 1917B, 713; Barclay v. Edwards, 267 U. S. 451, 45 S. Ct. 135, 136, 348, 69 L. Ed. 703; National Paper Co. v. Bowers, 266 U. S. 373, 45 S. Ct. 133, 69 L. Ed. 331; Billings v. U. S., 232 U. S. 261, 34 S. Ct. 421, 58 L. Ed. 596; Alaska Fish Salting & By-Products Co. v. Smith, 255 U. S. 44, 41 S. Ct. 219, 65 L. Ed. 489; Pacific, etc., Co. v. Alaska, 269 U. S. 269, 46 S. Ct. 110, 70 L. Ed. 270; Martin v. Dix, 52 Miss. 53, 24 Am. Rep. 661. See specially Wingfield v. South Carolina Tax Commission, 147 S. C. 116, 144 S. E. 846.

We do not think the statute involved either interferes with or burdens interstate commerce. It is expressly so provided in section 6. See Coe v. Errol, 116 U. S. 517, 6 S. Ct. 475, 29 L. Ed. 715; Hope Nat. Gas Co. v. Hall, 274 U. S. 284, 47 S. Ct. 639, 71 L. Ed. 1049; I. M. Darnell & Son Co. v. Memphis, 208 U. S. 113, 28 S. Ct. 247, 52 L. Ed. 413; Great American Tank Car Corp. v. Day, 270 U. S. 367, 46 S. Ct. 234, 70 L. Ed. 635; William E. Peck & Co. v. Lowe, 247 U. S. 165, 38 S. Ct. 432, 62 L. Ed. 1049; American Steel & Wire Co. v. Speed, 192 U. S. 500, 24 S. Ct. 365, 48 L. Ed. 538; Texas Co. v. Brown, 258 U. S. 466, 42 S. Ct. 375, 66 L. Ed. 721; Daily v. Swope, 47 Miss. 367.

We do not think the provisions of the Fifth amendment, or section 17 of the state Constitution, have any application here. Nothing is here involved except the power to tax intrastate business, and we do not think the statute here involved will take private property for public use within the meaning of that term as used in the Constitution. Not only is it a reasonable statute, and has proven a natural and efficient aid in the collection of the state's taxes, but it also has proven to be a protection to the local retailer as against those who "bootleg" merchandise into the state. In dealing with this, we must remember the commercial centers mentioned above, and the sending of merchandise into the state by trucks, thus depriving the state of a method of checking up on lawful taxes, and also the western border where the great Mississippi river flows, and the coast counties where dealers may receive shipments which cannot be checked up at any reasonable expense by any state auditing system. At first blush it might appear that the act discriminates in favor of a wholesaler within the state, but on a careful consideration of the section it is shown that there is nothing in the law to prevent outside wholesalers from procuring stamps and affixing them to mer-

chandise to be sold within this state. They are perfectly free to compete with wholesalers within the state.

There might be some question about this act affecting interstate commerce, were not the wholesalers outside this state free to buy and affix stamps to merchandise to be shipped into this state. If they do not choose to avail themselves of this privilege, they cannot complain, unless the law in its fair interpretation and operation directly affects interstate commerce, which, under the very terms of the act and under its practical administration, it does not.

We have no doubt but that there are many lawful regulations that operate even more harshly than the present statute. Take, for illustration, the Bulk Sales Law (Code 1930, sections 3353-3356), the constitutionality of which has been upheld in nearly all the states and in this state. Moore Dry Goods Co. v. Rowe, 97 Miss. 775, 53 So. 626. In this case we held that this law was not violative of the Fourteenth Amendment to the U. S. Constitution. In Cook v. Marshall County, 196 U. S. 261, 25 S. Ct. 233, 49 L. Ed. 479, it was expressly held by the United States Supreme Court that the equal protection of the law was not denied a retail tobacco dealer by the tax imposed on cigarette selling by the state of Iowa, because the statute excepted from the tax wholesale dealers doing business outside the state.

It follows from these views that the judgment of the court below must be reversed, and the cause dismissed.

Reversed and dismissed.

McGowen, J., delivered a dissenting opinion.

The appellee, Flora Drug Company, by its petition for mandamus against the state tax commission, sought to compel the latter to sell to it, as dealer, the stamps required by section 6 of chapter 92, Laws of 1932, to be affixed to its tobacco, bought without the state, from a

dealer who had not affixed the stamps so required. The circuit court of Hinds county held the regulatory provisions of this section to be unconstitutional and void; and from that judgment the cause was appealed to this court.

To my mind it is perfectly clear that the regulatory provisions of section 6 of the above act placed upon retail dealers in tobacco, and products containing tobacco, deprive such dealers of their property without due process of law, thereby violating the Fourteenth Amendment to the Constitution of the United States, and section 14 of the Mississippi Constitution of 1890. And, further, that the requirement of section 6 that appellee, as a retail dealer, shall take its cigars, bought from dealers or factories without the state, to a wholesale dealer within the state, in order to have the stamps affixed, as required by said section 6, denies appellee the equal protection of the law. The requirement is unreasonable, unnecessary, and arbitrary.

By the terms of section 6 of said chapter, unless the retail dealer, within forty-eight hours after the receipt of a shipment of cigars, or other like property, shall take that property to the nearest wholesale dealer operating under a permit from the state, to have the property stamped in accordance with the requirements of the act, he becomes a violator of the law, and his property is thereby rendered worthless to him; the effect thereof being, so far as the retail dealer is concerned, confiscation of his property. The retail dealer has no power over, or control of, the parties beyond the confines of the state with whom he deals. He cannot force such wholesalers to comply with the stamp law any more than could the Legislature—neither one has any control over that situation.

In my opinion, the dealer without the state who sells to retail dealers within the state could not consent to become the agent of the state, affixing the stamps to the

goods sold by him, according to the judgment of such dealer without the state as to the retail price which its customer in Mississippi, the retail dealer, should receive therefor, without at least personal conference and contact with the latter. This act deprives the retail dealer within the state, purchasing such property, of any voice in the fixation of the retail price of his property, lawfully acquired from without the state. Further, it vests in the wholesale dealer within the state an undue and unfair control over those retailers who do not choose to purchase their tobacco or cigars from them. In the first place, it is humiliating to a retail dealer to be forced to apply to one with whom he does not choose to deal to have the stamps affixed to the broken packages, as required under this law.

If the Flora Drug Company should receive cigars or cigarettes from without the state in unbroken packages, with no stamps affixed, it must bear the unusual expense of transporting its property from its place of business, within the forty-eight-hour period, to the nearest wholesale dealer—in the case at bar about twenty-eight miles—and must there await the pleasure of the latter to have the stamps affixed, must unpack the goods, break up the packages, have the stamps affixed by the wholesale dealer at his pleasure and convenience, repack the goods, and take them back to his place of business. He is thereby required to pay this additional cost from the anticipated profits; and, if he undertakes to pass this extra cost to the consumer, he is unable to meet competition in the sale of his goods. The main opinion takes no account of the increased cost or inability to meet competition.

The inconvenience is great, but the majority opinion in this case eliminates from its consideration the absolute tyrannical control vested in the wholesale dealers of this state. It must, of necessity, be a powerful bludgeon in the hands of these dealers. The wholesaler is permitted to operate both a wholesale and a retail busi-

ness, and to affix his own stamps to goods bought from without the state. Presumably he could do likewise if he operated a score or more retail stores.

There is a school of thought in the United States, among the merchants and traders and economists, as disclosed by many articles in the trade journals, public prints, and magazines, which holds that the payment of profits to the wholesale dealer is a waste of money, a useless tax upon the retailer and the consumer. There are in this country many large factories which decline to deal with and through wholesalers and jobbers. It is evident that many retail dealers prefer to buy from the factory direct, eliminating in this way transportation and other costs and trade profits.

From the economic standpoint, the continuance of trade relations between the states is just as essential as the predominent establishment of trade relations between nations. If dealers in every state are required by the stringency of the law to deal only within the confine of the state, or else lose their property, or profits, which is property, the time is at hand when the economic situation would be wrecked, should that idea of intrastate, as against interstate, trade be brought to pass.

Since the Boston Tea Party it is doubtful if a more drastic regulatory law has been successfully foisted upon a people living under a republican form of government, with its freedom, and liberty to contract. I have supposed that the people of this country were at liberty to make their contracts to purchase articles from whom and where they found it to their advantage.

In my opinion, there are two classes of retail dealers in cigars and tobacco clearly declared by the act—those dealers who purchase their goods from wholesale dealers within the state, with the stamps affixed; and those retail dealers who purchase these articles from without the state, whether from a factory or a dealer, without the stamps affixed. I think it does not need citation of author-

ities to demonstrate, beyond reasonable controversy, that the latter class is made to pay more for their goods by the operation of this act, in the cost of transporting their goods to a wholesaler, opening the original packages, re-packing them, and transporting them back to the place of business.

I believe there are large areas in the Mississippi Delta, at this time, where flood waters are rampant, where it would be necessary for the retail dealers to transport their goods by boat to a wholesale dealer, there to be stamped. This seems to me to be entirely unnecessary. It does seem that it would be better that an officer of the state, under obligations to it, and responsible for his official actions to all the people of the state, should ex-ercise that function, seeing to it that the stamps were affixed for the retail dealer. What I have said above in regard to the flood is not a rare occurrence; floods in the Mississippi Delta are fairly regular and frequent.

The effect of the law upon those dealers who are far from the railroad and good roads is to interfere with their dealing freely in merchandise affected by said law, except through purchase from wholesale dealers located within the state. The latter will select those goods which are most profitable to them; and will deal with the sellers of the commodities who will give to him—the wholesaler —the most favors. And the retail dealer is helpless to combat this tyrannical rule, without loss of money, time, and property. He must not only yield to the prices of the wholesalers within the state, but he must accept those articles of merchandise and those brands which suit the fancy of the wholesale dealer with whom he deals.

I have eliminated from my view the question of con-venience, although in this case it is a powerful argument. I am basing my judgment that this act is beyond ques-tion unconstitutional, on the ground that it causes the re-tail dealers, situated as the appellee here is, to be mulcted in heavy costs in loss of time and of profits, and loss of

ability to compete with others of that trade; all of which are property, taken without due process of law.

It is not insisted that any other state has enacted so drastic a law or sought so rigidly to control the actions of its retail merchants. The very act itself discloses that the Legislature which passed it doubted the validity of section 6, because they provided in the act itself another plan to be inaugurated in case this section should be declared violative of the federal or state Constitution.

This is unique legislation; a strong expression of the Legislature's construction of its own act, which is more impressive than the declarations of an individual. Much is quoted, in the main opinion, from the declaration of a prominent attorney who filed a brief herein, comparing the Tobacco Act of 1930 (Laws 1930, chapter 90, article 3) with this one. It may be said, in answer to that, that the tax levy, and the property upon which the tax is levied, are quite different, as a comparison of the act of 1930 with the act of 1932 will fully disclose. It might be further said that the vigilance of different officers in the enforcement of a tax law may be clearly discernible. This may or may not be an answer; but it is entitled to some weight in considering the results of a comparison between the two acts.

The cost to the retailer who buys from without the state from one who does not affix the stamps is, in my opinion, arbitrary, oppressive, and cannot be justified upon the theory that the state is now getting much money. I am in full sympathy with the effort to thwart the bootlegging of the commodity involved in this act, as I am in sympathy with all efforts and movements which undertake to thwart the bootlegging of any commodity in violation of law. I cannot bring myself to believe, however, that there is such a vast difference in the honesty of wholesalers as compared with retailers. I believe that the majority of people are honest; and I do not believe so strict a law can be justified on account of the boot-

legging of the article involved. It is a matter of common knowledge that bootlegging of gasoline is carried on along the borders of the state in all directions. There will always be dishonest people; but in my judgment there will always be the great majority who are honest, and who will not smuggle, or undertake to steal from the government. No doubt there will be some who will evade this law, or any other which may be passed. But can it be said, because a few rob the government of its just dues, that the rights and liberties of the great majority shall be endangered? I think not.

The property here involved is of the same kind, used for the very same purposes, and under the same conditions, and ought not to be separated into different classes for taxation; nor should the method of taxation be differently enforced merely for the reason that the property belongs to different owners, the one buying that class of property within the state, the other buying it without the state.

There is no logical, substantial reason for immense disparity in the two methods. Equally inexpensive reasonable regulations for complying with the law should and can be accorded to all alike. In practical effect a law-abiding citizen cannot buy this class of goods from a dealer without the state, without being subjected to appreciable loss, and general impairment of this organized business.

In this case, construing the act in question to be unconstitutional would not leave the taxing powers helpless. They have already unanimously prepared their line of defense and method of taxation, in the event they lose this battle. I think the circuit court correctly held that this act violates the fundamental law, and its judgment should be affirmed.

In conclusion, let me emphasize the fact that this case presents no question of the power of the state to tax;

the complaint here challenges the power of the sovereign to so burden and oppress, capriciously and arbitrarily, this retail dealer in the payment thereof, as to destroy his opportunity for profit. The business is private. The law unduly and harshly requires the dealer to submit himself to his competitor in order that he may comply with it. Under the guise of collection of its revenue, this dealer is caused by legislative fiat to kneel to his competitor as a serf to a satrap. The regulation imposes unnecessary and unreasonable burdens and restrictions upon the retail dealers who purchase tobaccos from without the state. Jay Burns Baking Co. v. Bryan, 264 U. S. 504, 44 S. Ct. 412, 68 L. Ed. 813, 32 A. L. R. 661; Louis Liggett Co. v. Baldridge, 278 U. S. 105, 49 S. Ct. 57, 73 L. Ed. 204.