## ALBRITTON *v.* CITY OF WINONA.

(In Banc.   Feb. 7, 1938.)

[178 So. 799.   No. 33074.]

W. E. Morse, of Jackson, for appellant.

84

**W. E. Gore**, of Jackson, Amicus Curiae.

Forrest B. Jackson, H. H. Creekmore, Garner W. Green, Louis M. Jiggitts, all of Jackson, and W. T. Knox, of Winona, for appellee.

Argued orally by **W. E. Morse**, for appellant, by **W. E. Gore**, amicus curiae, and by **Forrest B. Jackson**, for appellee.

**Smith, C. J.**, delivered the opinion of the court.

This is an appeal from a decree validating a proposed issue by the appellee of serial bonds aggregating $35,000 rendered in a proceeding authorized for that purpose by section 313, Code 1930. The bonds are to be issued under chapter 1, Laws of First Extraordinary Session of 1936, and the appellant's claim is that the provision of the statute authorizing the levy of taxes for the payment of the bonds violates the due process of law provision of the Fourteenth Amendment to the Federal Constitution and of section 14 of our State Constitution, and also that it violates sections 17, 183, and 258 of our State Constitution.

The preamble to the statute sets forth the reason for the enactment of the statute and the purposes sought to be accomplished by it, which preamble, together with section 1 of the statute, the reporter will set forth in full. The statute then creates the Mississippi Industrial Commission and charges it with certain duties, section 2 et seq., among which are to make effective the "declared public policy of this state to balance agriculture with industry, and for that purpose is hereby authorized and empowered to determine, under the provisions of this act, whether the public convenience and necessity require that any municipality shall have the right to acquire lands and thereon to erect industrial enterprises and to operate them and to dispose of such lands and industrial enterprises." Section 7. To this end it is authorized, when requested by a municipality, to investigate and determine, in the manner provided by the statute, whether the public convenience and necessity require that the municipality be authorized "to acquire,

to own, and to operate the particular type of industry found suited to the needs of that municipality under the provisions of this act." Section 8. If and when the commission grants this cerificate of public convenience and necessity, the municipality is authorized to acquire, own, and operate the particular industry set forth in the certificate, and "when and to the extent authorized by said commission . . . to sell, lease or otherwise dispose of such industrial enterprise or enterprises, in whole or in part, on such terms and conditions and with such safeguards as will best promote and protect the public interest." Section 18. The municipality may not operate the industry itself unless authorized by the commission so to do, but if the commission so authorizes, it may acquire the facilities for the operation of the industry and lease them, as hereinbefore said, to individuals or private corporations.

When so authorized by the commission, a municipality may issue serial bonds, with the approval of two-thirds of its qualified electors. The commission "shall determine the amount of taxes necessary to be levied and collected annually to retire the bonds and pay interest coupons and to create a sinking fund for the payment of said bonds and interest so that the annual tax levy shall be uniform throughout the period for which the bonds are issued," section 14, which annual tax the municipality must levy. Section 18 of the act provides that "all income from any lease or contract for the operation or from the disposition of said industrial enterprise shall be paid into the bond sinking fund provided for the bonds issued under the provisions of this act for the retirement of said bonds and the interest thereon, and such income or proceeds shall not be used by the municipality for any other purpose except as to disposition of surplus income authorized above, and shall be subject to all of the provisions hereof relative to said sinking fund."

A certificate of public convenience and necessity was issued by the Mississippi Industrial Commission in the manner provided by the statute to the City of Winona "to acquire, to own and to operate, subject to the hereinafter limitations, a hosiery, knitting and wearing apparel manufacturing plant." The certificate then provides the acquisition by the city of not less than 20,000 square feet of land within the city limits, and that "the City of Winona, Montgomery County, Mississippi, may construct on said land a municipal factory building containing not less than fourteen thousand (14,000) square feet of floor space, and expend therefor not exceeding the sum of thirty-five thousand dollars ($35,000.00), but no part of said amount shall be expended for machinery or equipment, and said municipality shall not operate said industrial enterprise, but is authorized to lease or rent said lands and building after acquirement and construction to some person, firm or corporation, for a period of not less than twenty-five (25) years on terms and conditions to be submitted to this Commission for approval before any such contract for lease, rental and operation shall become finally binding upon said municipality. Provided, however, if for any reason the plant cannot be leased or said lease shall for any reason terminate, then the municipality may operate the same under the direction of the municipal authorities."

Another order was made by the commission reciting that the municipal officers of the City of Winona "are not presently suitable, competent, or fit persons to direct and control the operations of said industrial enterprise, but for the best municipal public interests and welfare said enterprise should be operated under lease or contract for the general municipal welfare by some private individual, firm or corporation, which said contract, however, must be approved by this Commission under provisions of said Mississippi Industrial Act, before the same is effective."

The proposed bond issue was submitted to and approved by more than two-thirds of the city's qualified electors. The record relating thereto was then, under the provisions of section 313, Code 1930, submitted to the state's bond attorney, who certified that in his opinion "the proposed bonds are legal and should be validated." The record was then filed, in accordance with section 313, in the court below, and, after the notice to the taxpayers, required thereby, had been given, the appellant appeared on the day fixed for hearing objections to the issuance of the bonds, and objected thereto; and from the decree validating the bonds has brought the case to this court.

The discussion of the questions here presented may be well begun by setting forth certain fundamental and accepted principles that underlie the American theory of government, in the light of which this case must be decided.

1. The purpose for which the state exists is to promote the welfare of its citizens—their peace, happiness, and prosperity. Preamble to the Federal Constitution; section 6 of our State Constitution; Mayor, etc., of City of New York v. Miln, 11 Pet. 102, 9 L. Ed. 648, and Charles River Bridge v. Warren Bridge, 11 Pet. 420, 9 L. Ed. 773; Brown v. Beatty, 34 Miss. 227, 69 Am. Dec. 389, and Notgrass Drug Co. v. State, 175 Miss. 358, 165 So. 884.

2. The government is the state's agent, created by its Constitution and charged thereby with the duty of accomplishing this purpose, which duty rests with equal force on each of the departments into which the government is separated—the executive, the legislative, and the judicial.

3. The legislative department is primarily charged with the duty of determining by what means this purpose can be accomplished. To that end it is invested, by section 33 of our State Constitution, with all legis-

lative power, except in so far as other sections of the Constitution place a limitation thereon.

4. Upon the judicial department, because of the nature of its duties, devolves the duty of determining whether in specific instances the other two departments have exceeded the powers granted to them by the Constitution.

5. In determining whether an act of the Legislature violates the Constitution, the courts are without the right to substitute their judgment for that of the Legislature as to the wisdom and policy of the act and must enforce it, unless it appears beyond all reasonable doubt to violate the Constitution. "Nor are the courts at liberty to declare an Act [of the legislature] void, because in their opinion it is opposed to a spirit supposed to pervade the Constitution, but not expressed in words." 1 Cooley, Constitutional Limitations (8 Ed.), at page 351, quoted with approval in Mississippi State Tax Commission v. Flora Drug Co., 167 Miss. 1, at page 20, 148 So. 373, at page 376.

With this preface we come to the specific questions presented for consideration, which will be disposed of seriatim.

The state's taxing power can be resorted to only for a constitutionally valid public or governmental purpose, so that the question here is whether the purpose for which the tax is to be levied is constitutionally valid.

1. *Due Process of Law.* The vague and general phrase "due process of law" is not defined by the Constitution, consequently the courts have been compelled to develop its concept and content—to say what it means. Davidson v. New Orleans, 96 U. S. 97, 24 L. Ed. 616. In the course of so doing they have expanded it beyond its literal meaning of "due procedure" and have brought within it substantive as well as procedural rights. Cf. Brandeis and Holmes, JJ., in Whitney v. California, 274 U. S. 357, page 373, 47 S. Ct. 641, 647, 71 L. Ed. 1095, and

Stone, J., in Wright v. United States, 58 S. Ct. 395, 82 L. Ed. —, decided January 17, 1938. When applied to substantive rights it is now interpreted to mean that the government is without the right to deprive a person of life, liberty, or property by an act that has no reasonable relation to any proper governmental purpose, or which is so far beyond the necessity of the case as to be an arbitrary exercise of governmental power. Mississippi State Tax Comm. v. Flora Drug Co., supra, and numerous decisions of the Supreme Court of the United States, e. g., Nebbia v. New York, 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469; West Coast Hotel Co. v. Parrish, 300 U. S. 379, 57 S. Ct. 578, 81 L. Ed. 703, 108 A. L. R. 1330; Green v. Frazier, 253 U. S. 233, 40 S. Ct. 499, 502, 64 L. Ed. 878; House v. Mayes, 219 U. S. 270, 31 S. Ct. 234, 55 L. Ed. 213; Jones v. Portland, 245 U. S. 217, 38 S. Ct. 112, 62 L. Ed. 252, L. R. A. 1918C, 765, Ann. Cas. 1918E, 660.

Chapter 1, Laws of First Extraordinary Session of 1936, seeks to promote the public welfare (1) by providing an opportunity for laboring men to obtain employment, without which a large number of them would be without an opportunity to earn a livelihood; (2) to provide means for the processing of the natural resources and agricultural products of the state, for want of which these products are being carried beyond the borders of the state for processing, to the detriment of its citizens; and (3) to promote agriculture. The economic condition which here confronted the Legislature was this: (1) Thousands of our citizens, throughout the state, who are dependent on manual labor for a livelihood were without employment, and under the state's then economic and industrial setup would probably continue indefinitely so to be; and (2) agriculture, from which most of the state's citizens, either directly or indirectly, derive a livelihood, was at a low ebb with nothing to indicate that it would not indefinitely so continue. The care of the poor, the

relief of unemployment, and the promotion of agriculture and industry are undoubtedly proper governmental purposes, are so recognized everywhere and by all. The question here then is: Has the method provided by the statute for those purposes a reasonable relation thereto, and is it not so far beyond the necessity of the case as to be an arbitrary exercise of governmental power? The statute authorizes municipalities to (1) own and operate manufacturing plants, and (2) to sell or lease them, in whole or in part, for operation by individuals or private corporations. The specific question here is the validity vel non of the lease provision of the statute, but, if the Legislature cannot constitutionally permit municipalities to own and operate industrial plants for the accomplishment of the intended purposes, it cannot, of course, accomplish such purposes by permitting them to acquire and lease such plants for operation by private persons and corporations. We will discuss first, therefore, the ownership provision of the statute.

The ownership by municipalities of business enterprises that are usually designated as public utilities has long been recognized as valid, but the enterprise here is not within that category and belongs to the class usually owned and operated by private individuals. That fact is not an insuperable obstacle, for the state and its subdivisions have long been permitted to engage in such enterprises, provided the public interest requires. Jones v. Portland, and Green v. Frazier, supra. This state owns a very large farm on which it produces and sells a large quantity of cotton and other crops—a business usually engaged in by private individuals—the necessity and, therefore, the justification therefor being to give its convicts employment. But the validity of the exercise of the taxing power does not rest alone on necessity, as Judge Cooley has admonished us in People v. Township of Salem, 20 Mich. 452, 4 Am. Rep. 400, where in holding that taxes can be levied only for public purposes

he said: "I do not understand that the word public, when employed in reference to this power, is to be construed or applied in any narrow or illiberal sense, or in any sense which would preclude the Legislature from taking broad views of State interest, necessity or policy, or from giving those views effect by means of the public revenues. Necessity alone is not the test by which the limits of State authority in this direction are to be defined, but a wise statesmanship must look beyond the expenditures which are absolutely needful to the continued existence of organized government, and embrace others which may tend to make that government subserve the general well-being of society, and advance the present and prospective happiness and prosperity of the people." "The end being legitimate [here, the relief of unemployment and the promotion of the state's agricultural and industrial welfare], the means is for the legislature to choose," Carmichael v. Southern Coal & Coke Co., 301 U. S. 495, 57 S. Ct. 868, 876, 81 L. Ed. 1245, 109 A. L. R. 1327, the only limitation thereon under due process being that the means chosen must not be so far beyond the necessity of the case as to be an arbitrary exercise of governmental power.

Manufacturing enterprises, as all will agree, will tend to relieve unemployment and both directly and indirectly furnish markets for agricultural and other products. This state, in comparison with others, has few such enterprises, and it has long sought in vain to procure them by offering them special inducements, e. g., exemption from taxation. The Legislature has determined that the public interest, as set forth in the preamble to the statute, requires the adoption of another method for procuring them, to-wit, municipal ownership in whole or in part thereof. The method thus adopted undoubtedly has a reasonable relation to the purpose sought to be accomplished, and whether it is so far beyond the necessity of the case as to be merely an arbitrary exercise

of governmental power is a question of fact, or of an inference to be drawn from facts, the relative facts being of a social and economic character. Some of these facts are set out in the preamble to, and section 1 of, the statute, but the Legislature was not confined thereto, and we must take into consideration any other relative sustaining facts which may reasonably be conceived to exist. If from these facts the reasonableness of the method adopted for accomplishing the desired purpose appears, the statute is valid, or, if different reasonable inferences can be drawn therefrom, the Legislature is entitled to its judgment, and we must permit the statute to be enforced, even though we should doubt its wisdom and be of the opinion that a different and better method could be devised for accomplishing the desired purpose.

But it is said, in effect, that the engaging by a state, or its political subdivisions, in manufacturing enterprises, is a complete departure from the concept our forefathers had of the powers and duties of the state and is a step towards socialism. This ambiguous and ill-defined word, which is given an "exceedingly wide range of specific connotations," according to the use desired to be made of it, came first into use in its modern sense in 1827. 14 Ency. of The Social Sciences, 188. Every intervention of any consequence by the state and national governments in the economic and social life of the citizen has been so branded, beginning in the latter part of the last century with governmental control and regulation of industries usually owned and operated by private individuals and which have come to be recognized as public utilities. We must not permit ourselves to be subjected to the tyranny of symbols. The due process of law provisions of our constitutions do not enact Adam Smith's concept of the negative state, one of the main functions of which would be to stand aloof from intervention in the social and economic life of its citi-

zens. This concept of the state was probably acted upon in the early history of this country but has long since been discarded, beginning with the social and economic security statutes of the latter part of the last century, and evidenced today by numerous such statutes of the states and federal governments. "It is manifest," in the language of the Supreme Court of the United States in Home Building & Loan Association v. Blaisdell, 290 U. S. 398, 442, 54 S. Ct. 231, 241, 78 L. Ed. 413, 431, 88 A. L. R. 1481, from a "review of our decisions that there has been a growing appreciation of public needs and of the necessity of finding ground for a rational compromise between individual rights and public welfare. The settlement and consequent contraction of the public domain, the pressure of a constantly increasing density of population, the interrelation of the activities of our people and the complexity of our economic interests, have inevitably led to an increased use of the organization of society in order to protect the very bases of individual opportunity."

Again it is said that, if the state and its subdivisions can own and operate a manufacturing enterprise, it can then take over and operate every business and industry, thereby bringing all its citizens into direct dependence on the state. This, of course, under due process of law could not be done, for the liberty of the citizen to acquire, own, and use private property cannot thereunder be destroyed or arbitrarily interfered with. The statute here under consideration does not create a state of municipal monopoly nor interfere with the right of individuals to engage in the business of manufacturing raw materials into finished products. The due process clauses of our consitutions must not be construed so as to put the state and federal governments into a straitjacket and prevent them from adapting life to the continuous change in social and economic conditions. That the framers of our constitutions may not have visualized

the present public needs is of no consequence, for, as the Supreme Court of the United States further said in Home Building & Loan Association v. Blaisdell, supra, "it is no answer to say that this public need was not apprehended a century ago or to insist that what the provision of the Constitution meant to the vision of that day it must mean to the vision of our time. If by the statement that what the Constitution meant at the time of its adoption it means to-day, it is intended to say that the great clauses of the Constitution must be confined to the interpretation which the framers, with the conditions and outlook of their time, would have placed upon them, the statement carries its own refutation."

We must never forget that, in the words of John Marshall, a constitution is "intended to endure for ages to come, and, consequently, to be adapted to the various crises of human affairs. To have prescribed the means by which government should, in all future time, execute its powers, would have been to change, entirely, the character of the instrument, and give it the properties of a legal code. It would have been an unwise attempt to provide, by immutable rules, for exigencies which, if foreseen at all, must have been seen dimly, and which can be best provided for as they occur." McCulloch v. Maryland, 4 Wheat. 316, 415, 4 L. Ed. 579. While the Federal Constitution was in process of adoption by the states, Alexander Hamilton, in No. 32 of the Federalist, said: "We are not to confine our view to the present period, but to look forward to remote futurity; constitutions of civil government are not to be framed upon a calculation of existing exigencies, but upon a combination of these with the probable exigencies of ages, according to the natural and tried course of human affairs. Nothing, therefore, can be more fallacious than to infer the extent of any power proper to be lodged in the national government, from an estimate of its immediate necessities. There ought to be a capacity to provide

for future contingencies as they happen; and as these are illimitable in their nature, it is impossible to safely limit that capacity." See, also, 11 Am. Jur., Constitutional Law, section 51, and cases there cited.

Growth is the life of the law, and when it ceases to grow and to keep pace with social and economic needs it becomes a hindrance instead of an aid to the public welfare. Cf. Holden v. Hardy, 169 U. S. 366, 18 S. Ct. 383, 42 L. Ed. 780; Hurtado v. California, 110 U. S. 516, 4 S. Ct. 111, 292, 28 L. Ed. 232; Missouri v. Lewis, 101 U. S. 22, 25 L. Ed. 989; Hutcheson, Law as Liberator, page 113 et seq., and Hutcheson, "The Common Law of the Constitution," 15 Texas Law Review, page 329 et seq. We must not be influenced by vague notions of natural law, nor decide due process of law cases in accordance with our own particular economic theories— by what Dean Pound designates as "an idealized political picture of the existing social order." The Theory of Judicial Decision, 36 Harvard Law Review, 641, 656. So to do would frequently result in deciding cases "upon an economic theory which a large part of the country does not entertain" (Holmes, J., in Lochner v. New York, 198 U. S. 45, 75, 25 S. Ct. 539, 546, 49 L. Ed. 937, 949, 3 Ann. Cas. 1133), "prevent the making of social experiments that an important part of the community desires" (Holmes, J., in Truax v. Corrigan, 257 U. S. 312, 344; 42 S. Ct. 124, 134, 66 L. Ed. 254, 268, 27 A. L. R. 375), and in the "exercise of the powers of a super-Legislature— not the performance of the constitutional function of judicial review" (Brandeis, J., in Jay Burns Baking Co. v. Bryan, 264 U. S. 504, 534, 44 S. Ct. 412, 421, 68 L. Ed. 813, 836, 32 A. L. R. 661). In the oft-quoted language of Mr. Justice Holmes, "The Fourteenth Amendment does not enact Mr. Herbert Spencer's Social Statics. . . . A Constitution is not intended to embody a particular economic theory, whether of paternalism and the organic relation of the citizen to the state or of laissez

faire. It is made for people of fundamentally different views." Lochner v. New York, supra.

Cases from other jurisdictions may be cited holding statutes somewhat similar to the one here under consideration invalid under due process, but cases holding such a statute valid thereunder may also be cited. We will not pause to discuss these cases, with one exception that will hereinafter appear, for the reason that they were decided (1) on social and economic facts from which we must draw our own conclusions (West Coast Hotel Co. v. Parrish, supra); (2) under the social and economic conditions then existing, which conditions are ever changing and each case must be decided on the social and economic conditions that exist when the statute was enacted or, probably, at the time the case is decided; and (3) under social and economic theories which are no longer universally entertained. Home Building & Loan Association v. Blaisdell, supra; West Coast Hotel Co. v. Parrish, supra; Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77; German Alliance Ins. Co. v. Lewis, 233 U. S. 389, 34 S. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189; Euclid v. Ambler Realty Co., 272 U. S. 365, 47 S. Ct. 114, 71 L. Ed. 303, 54 A. L. R. 1016; Noble State Bank v. Haskell, 219 U. S. 104, 31 S. Ct. 186, 55 L. Ed. 112, 32 L. R. A. (N. S.), 1062, Ann. Cas. 1912A, 487; Brotherhood of Railway, etc., Clerks v. Texas & N. O. R. Co., D. C., 24 F. (2d) 426

In Green v. Frazier, supra, the Supreme Court of the United States had under consideration several North Dakota statutes providing for the establishment and operation of a bank, the entire capital stock of which should be state owned; the acquisition, ownership, and operation by the state of plants for the manufacture of farm products, and warehouses, elevators, flour mills, factories, plants, machinery, and equipment therefor, all to be operated under the name of the North Dakota Mill & Elevator Association; and the establishment of a state owned

and controlled building and loan association. Negotiable bonds to be paid by taxation were authorized to be issued and sold for the purpose of obtaining the money with which to carry out the purposes of the statute. The court held that these statutes did not present "a case of undertaking to aid private institutions by public taxation," and therefore did not violate due process of law. It is true that the statutes there were specifically authorized by the State Constitution, but if a provision in a State Constitution does not violate the due process of law prohibition of the Fourteenth Amendment to the Federal Constitution, it necessarily follows that a similar provision in a state statute does not violate the due process of law prohibition of the State's Constitution. The court there again said, as we do here: "Questions of policy are not submitted to judicial determination, and the courts have no general authority of supervision over the exercise of discretion which under our system is reposed in the people or other departments of government. . . . With the wisdom of such legislation, and the soundness of the economic policy involved we are not concerned. Whether it will result in ultimate good or harm it is not within our province to inquire."

The tax, of which complaint is here made, is to be levied, however, not for the acquisition and operation by a municipality of a manufacturing enterprise, but for the purchase of land and construction of a building thereon to be leased to individuals or private corporations. If the statute permits a lease of the property that would strip it of the purpose for which the statute permits its acquisition, as hereinbefore outlined, and permitted it to be devoted wholly to private purposes, the tax to be levied in order to pay the bonds, by the sale of which the money for purchasing the property is to be obtained, would then not be for a public purpose but in aid of private individuals, which under due process of law cannot be done. The statute does not so permit, for in all its

parts it contemplates that the proposed industry shall be operated for the accomplishment of the purposes outlined therein, either by the municipality itself or, if the municipal authorities and the Mississippi Industrial Commission deem best, by a lessee under a lease containing ''such terms and conditions and with such safeguards as will best promote and protect the public interest.''

The lease, therefore, must be of such character as will insure the continued operation of the proposed industry with power in the municipality, under the supervision and control of the Mississippi Industrial Commission, to enforce the continued operation; in other words, the character of the lease is to be such as, in effect, to constitute the lessee the municipality's agent for operating the industry without liability on the municipality to others growing thereout. ''If the end be public, it matters not that it is attained through a private channel.'' 1 Hares American Constitutional Law, page 286.

In Brown v. Beatty, supra, wherein the right of the Legislature to confer upon a railroad the right of eminent domain was upheld, the court said: ''Where such enterprises are engaged in by individuals under charters of incorporation, they are not the less undertakings in which the public have an interest. They are public works, intended to promote the interests of the community. The individual corporators, in the anticipated pecuniary benefit which may result to them, have an object and an interest distinct from that of the public. In that respect the enterprise is individual, and the corporation private. But the object and purpose of the incorporation are the public advantage. This gives to the work its public character. A corporation created by the legislature with a view to the construction of a work of public utility, is the agency or means by which its intentions are designed to be carried into effect.'' A municipality having the right to provide for the lighting of its streets may appoint an electric light company as its

agent for that purpose and pay it a compensation therefor. Reid v. Trowbridge, 78 Miss. 542, 29 So. 167.

The statute does not specifically prescribe the terms of this lease, but follows the usual course of leaving that to the public officers charged with the duty of carrying out the purposes of the statute, e. g., section 2455, Code 1930. We are not called on, and are without authority, to here specifically set forth and limit the provisions of such leases, and we must presume that the municipal officers and the Mississippi Industrial Commission will take care that the provisions of the leases will meet the requirements of the statute. If they do not, the leases will be void. It may not be amiss, however, to say that one effectual method for preventing the lessee from holding the property without carrying out the purposes for which it was acquired would be to insert in the lease a clause setting forth the character and capacity of the proposed industry, and providing for the termination of the lease if the lessee fails within a specified time to equip and operate the industry as described in the lease or discontinues for a specified time thereafter to so operate it. Leases of a similar character are not infrequent and are held to be valid, as will appear in our discussion of section 183 of our State Constitution, before proceeding to which two cases, because of the sources from which they come, should be considered.

In Citizens' Loan Association v. Topeka, 20 Wall. 655, 669, 22 L. Ed. 455, the court had under review a state statute authorizing municipalities to issue bonds payable to private individuals or corporations, to encourage them in establishing manufacturing plants within the municipalities issuing the bonds, for the payment of which municipal taxes would have to be levied. The court held that the taxes so levied would be for the benefit of private industry, and therefore not for a public purpose, consequently, the state was without the power to authorize the levy thereof, not because of any specific

provision of the State or Federal Constitutions, but because of an assumed limitation on legislative power, inherent in all free governments; in other words, because the statute was "opposed to a general latent spirit supposed to pervade or underlie the Constitution, [but not expressed in words]," a ground for invalidating statutes occasionally resorted to before the courts realized the possibilities of "due process," but which they have now abandoned and bring all such cases within or without "due process." 3 Willoughby on the Constitution of the U. S., page 1876; 11 Am. Jur., Constitutional Law, section 135, and authorities there cited. See, also, a criticism of that case by Mr. Justice Holmes, concurred in by Chief Justice Fuller and Justices Brewer and Peckham, in Madisonville Traction Co. v. St. Bernard Mining Co., 196 U. S. 239, 25 S. Ct. 251, 49 L. Ed. 462. That case, however, even if it had been rested on due process, is not in conflict with what we have hereinbefore said. There the bonds were donated to private individuals or corporations to be appropriated by them to their own private purposes, here the municipalities retain the ownership of the property leased, and the power to enforce its use for the accomplishment of the purposes for which the lease is made and the taxes levied.

In Carothers v. Town of Booneville, 169 Miss. 511, 153 So. 670, the court had under consideration a statute, the only section of which, except the enforcing clause, was as follows: "Be it enacted by the Legislature of the State of Mississippi, That the Mayor and Board of Aldermen of the Town of Booneville, Mississippi, be and they are hereby empowered and authorized to issue and sell bonds or certificates of credit in the sum of Ten Thousand ($10,000.00) dollars, or so much thereof as may be necessary, for and on behalf of the said Town of Booneville, Mississippi, and to pledge the taxable property of said town, and to make and collect all necessary tax levies to retire the same, the proceeds to be used in

procuring a lot or lots for, and in erecting a garment factory building in the said town of Booneville, said bonds to be issued and sold in whatsoever denomination, and to bear such rate of interest, and to mature at such time or times as the said mayor and Board of Aldermen may elect to provide.'' Carothers appealed from a decree validating the proposed issue of bonds. It appeared from the record that the town of Booneville intended to appropriate the proceeds of the bonds to the purchase of a lot and the erection of a building thereon to be leased to the Tupelo Garment Company for use by it in operating a garment factory. All that the court there said, in holding that the statute violated due process of law, was this: ''It will be seen from an analysis of the act that the credit of the town of Booneville is pledged for the payment of the bonds proposed to be issued, and that the municipality was not authorized to operate a manufacturing enterprise itself, but only authorized to issue bonds for the purpose of erecting a factory and to purchase a lot for such purpose. The act is one strictly in aid of a private corporation, and it is well settled in this state that taxes cannot be levied for private purposes.'' The statute did not provide that the property should be purchased and leased for the purpose of operating a manufacturing establishment in order to relieve unemployment and promote the agricultural and industrial welfare of the state, and that the lease should be made for a valuable consideration, on such terms as would enable the town of Booneville to enforce the use of the property by the lessee for such purposes. All these provisions appear expressly, or by necessary implication in chapter 1, Laws of First Extraordinary Session of 1936. The Legislature did not there declare, but has here declared, a legislative policy based on social and economic facts which justified the enactment of the statute. That case, therefore, is clearly distinguishable from the one here.

*Section 183 of the State Constitution.* This section is, in part, as follows: "No county, city, town, or other municipal corporation shall hereafter become a subscriber to the capital stock of any railroad or other corporation or association, or make appropriation, or loan its credit in aid of such corporation or association." The statute under consideration does not permit subscriptions to the stock of a corporation, or the loan of credit to a corporation or association; what it does permit is the leasing of municipal property for use by private individuals or corporations, so that the question here presented is: Does the lease provision of the statute permit an appropriation of property to private individuals or corporations within the meaning of section 183 of the Constitution? It will be best for us not to attempt here to strictly limit and define appropriation, as used in this section of the Constitution, but to do so gradually by the method of inclusion and exclusion as cases thereunder arise. So far we have held it to include a donation or gift of money or property, Adams v. Jackson Ry. Co., 78 Miss. 887, 30 So. 58; Jackson Ry. Co. v. Adams, 79 Miss. 408, 30 So. 694; Brister v. Leflore County, 156 Miss. 240, 125 So. 816, and a lease of property for strictly private purposes, Carothers v. Town of Booneville, supra, but not to include an appropriation of money in payment of a valid municipal debt, Reid v. Trowbridge, supra. In Carothers v. Town of Booneville, supra, an analysis of which we have hereinbefore set forth, the court, in holding that the statute there under consideration violated section 183 of the Constitution, said this: "The act is one strictly in aid of a private corporation, and it is well settled in this state that taxes cannot be levied for private purposes. . . . It is manifest to us that the act is in violation of section 183 of the state Constitution." The statute there did not require that the lease of the property should retain in the municipality power to enforce the use of the property by the lessee

for the purposes sought to be accomplished by the leasing of the property. The statute here so requires, and we have hereinbefore set forth our reasons for holding that the taxes to be levied under it are for a legitimate public purpose. The leases here contemplated by the statute, therefore, are not within the condemnation of section 183 of the Constitution.

Leases of an analogous character are generally held not to violate constitutional provisions similar to the one here under consideration. 5 McQuillin on Municipal Corporations (2 Ed.), section 2329; Taylor v. Commissioners of Ross County, 23 Ohio St. 22; City of Cincinnati v. Dexter, 55 Ohio St. 93, 44 N. E. 520; Sun Printing & Publishing Association v. New York City, 152 N. Y. 257, 46 N. E. 499, 37 L. R. A. 788; Admiral Realty Co. v. New York City, 206 N. Y. 110, 99 N. E. 241, Ann. Cas. 1914A, 1054; People v. City of Chicago, 349 Ill. 304, 182 N. E. 419; Churchill v. Grants Pass, 70 Or. 283, 141 P. 164. The language of the Supreme Court of Ohio in Taylor v. Commissioners, supra, 23 Ohio St. 22, at page 77, dealing with the lease of a municipally owned railroad, mutatis mutandis, applies here: "It is the road 'owned' by the municipality that is authorized to be leased. The public use for which the road was built, is to be preserved, and the power of leasing the right to use and operate it, is designed only as a mode of making such use available to the public. If, under color of this authority, it should be attempted to divert the work from the purposes for which it was authorized, and to subordinate the public to private interests, the attempt would be unwarranted, and the courts would be open to prevent or redress the wrong. . . . The constitution does not forbid the employment of corporations, or individuals, associate or otherwise, as agents to perform public services; nor does it prescribe the mode of their compensation. And if it should be deemed wise and economical to authorize municipalities, who own waterworks, or

gas works, to lease them as a means of supplying the public needs, we know of no constitutional impediment."

*Section 258 of the State Constitution.* This section provides that "the credit of the state shall not be pledged or loaned in aid of any person, association, or corporation," etc. If this section should be held to prohibit the state from authorizing its political subdivisions to pledge or loan their credit in aid of persons and private corporations, as to which we express no opinion, its inapplicability here will appear from the preceding discussion of section 183 of the Constitution.

*Section 17 of the State Constitution.* This section provides that "private property shall not be taken or damaged for public use, except on due compensation being first made to the owner or owners thereof, in a manner to be prescribed by law." The section has no application to the state's taxing power but only to the taking by it of specific property for public use; e. g., under its power of eminent domain. "A tax is not an assessment of benefits. It is . . . a means of distributing the burden of the cost of government. The only benefit to which the taxpayer is constitutionally entitled is that derived from his enjoyment of the privileges of living in an organized society, established and safeguarded by the devotion of taxes to public purposes. See Cincinnati Soap Co. v. United States, supra [301 U. S. 308, 57 S. Ct. 764, 81 L. Ed. 1122]. Any other view would preclude the levying of taxes except as they are used to compensate for the burden on those who pay them, and would involve the abandonment of the most fundamental principle of government—that it exists primarily to provide for the common good." Carmichael v. Southern Coal & Coke Co., supra. See, also, Mississippi State Tax Commission v. Flora Drug Co., supra.

Affirmed.

CONCURRING OPINION.

**Griffith, J.,** delivered the opinion specially concurring.

We all agree that, when a challenged statute is susceptible of a construction which will bring it within the Constitution, the duty of the court is to put that construction upon it, and thereupon to sustain it. Looking at the statute, here in question, in the light of that principle, I concur in the result reached that (1) the act is constitutional and (2) that the acquisition, and the proposed lease, of "a hosiery, knitting and wearing apparel manufacturing plant," is within constitutional allowance, provided the terms of the lease shall vest in the public authorities the ultimate control as regards the employment of the labor in said plant. But in my judgment the opinion as written by the Chief Justice goes too far as respects the grounds upon which the act is sustained, and not far enough in regard to the terms of the proposed lease. For that reason, and also because there is a dissent, it becomes my duty to briefly state my views, matured as a result of an examination of the entire field of the authorities on the subject.

One of the purposes expressed within the act is the alleviation of unemployment. From the earliest times in our history it has been regarded as a public purpose, and within the power of direct taxation, to keep the poor from starvation. Cooley's Constitutional Limitations (8 Ed.), 1026. Ordinarily, a man will break in and take before he will starve, and all will do this for their families. They will do so singly and in groups. Thus the public duty and purpose to furnish food and necessaries to the famished is traceable directly to the police power of the state. And since in such cases the state, or its authorized subdivisions, may afford direct relief or aid of money or supplies, or both, it may provide work, and if to do so it become necessary to enter within the confines of that which has always heretofore been considered the

domain of private enterprise, nevertheless the legislative power may so direct, under the established principle that whenever there is a constitutional power to accomplish a certain object the power includes, by implication, the authority to avail of all the necessary and proper means for the accomplishment of the particular object. Brister v. Leflore County, 156 Miss. 240, 248, 125 So. 816.

But when it is said that, without express constitutional provision to that effect, the field of private enterprise, the domain of the general manufacturing business, may be directly entered as a public purpose because, and because only in so doing, other businesses and other occupations will be incidentally benefited and thereby the public welfare promoted, this, I think, goes too far and has no support in any adjudicated case in this country and is against the fundamentals of a free constitutional system. No authoritative case can be found where this has been allowed, except where the state itself not only owned the facilities but actually managed and operated them,—as was the case, Green v. Frazier, 253 U. S. 233, 40 S. Ct. 499, 64 L. Ed. 878, and as is the case of our penitentiary system of which mention has been made.

In Citizens' Savings Association v. Topeka, 20 Wall. 655, 665, 22 L. Ed. 455, the court, after saying that aid by taxation to any class of manufactures, not public in their nature, is not a public purpose, went on to observe: "If it be said that a benefit results to the local public of a town by establishing manufactures, the same may be said of any other business or pursuit which employs capital or labor. . . . No line can be drawn in favor of the manufacturer which would not open the coffers of the public treasury to the importunities of two-thirds of the business men of the city or town." In this brief quotation from our highest court there is pointed out the insuperable difficulty, the insurmountable obstacle, if our constitutional system is to be preserved,

in holding that, merely because the establishment of manufacturing or industrial enterprises will promote the public good or will benefit other occupations, this may be done by the state or its subdivisions, upon a legislative declaration of a public purpose; for, so to hold is to throw the door wide open to take over the wholesale and retail merchantile business, or the farms, or the publishing business, including the public newspapers, or any other business, and to establish a communistic or soviet state, or else embark upon a boundless and uncharted sea without rudder or compass.

But in the matter of unemployment, and confining the problem to that purpose alone, a tangible line may be drawn. We know from public statistics that the average of unemployment has run throughout several past years at about 10 per cent. of the total population; and because of new inventions, past and future, we can well estimate that the percentage of unemployment, if private employment alone is looked to, will continue throughout the years which are to come, at about or not less than 10 per cent. Up to that percent there is an ascertained and well-defined obligation upon the public in respect to this unemployment problem; and in this connection it is to be noted that the act here in question limits the amount which may be invested in these industrial enterprises at 10 per cent. of the assessed valuation of all the taxable property.

Since the field of industrial enterprise, or the domain of the general manufacturing business, may be entered as a public purpose for the alleviation of unemployment, but for that object only, there comes into operation here, and unavoidably so, the principle that public money raised by taxation for the benefit of the indigent or unemployed must be spent under the direction and control of the public authorities. It cannot be turned over to a private agency to do with it as that agency may please. All the authorities everywhere are to that effect. It

was expressly and distinctly so held in Miller v. Tucker, 142 Miss. 146, 105 So. 774, 780. Whence it follows that when a manufacturing establishment, such as here proposed, is furnished by taxation for the alleviation of unemployment,—and that, as I maintain and repeat, is the only constitutional ground upon which such an establishment may be so furnished,—the operations, as to employment therein, must in a reasonable measure be under the control of the public authorities, as regards who shall be employed, and as to minimum wages, and maximum hours of work, else the operation will not be public but will be private, and cannot be aided through the means of taxation.

Unless the lease carry the necessary provisions in respect to employment as indicated in the foregoing paragraph, the only other constitutional method by which the property could be leased would be at its full, fair market rental value after an honest and deliberate effort to obtain such value, for there nothing of monetary value would be donated to the lessee. But, if the lease be at a reduced rate or price as compared with the fair market value, and do not carry the provisions for ultimate control of the employment features as above mentioned, there would be a donation or gratuity pro tanto in manifest conflict with sections 183 and 258, Constitution 1890, to say nothing of the due process section.

The opinion in chief does not commit the judges, who speak thereby, upon this question of the essential outlines of the proposed lease. It says that it will be presumed that the municipal officers and the commission will take care that the provisions of the lease will meet the requirements of the statute. What they must do is to see that those provisions will meet the requirements of the Constitution. It is true, as a general rule, that in passing upon the constitutionality of a statute courts will not by anticipation decide upon the details of an additional step proposed to be taken but not yet

taken, if the step be such that in its details it will be within the Constitution when it is taken. But here we have a bond validation proceeding which, when affirmed, renders the bonds incontestable, whatever may subsequently happen. Before this bond money is allowed to be spent, the municipal authorities, the commission, and the protective lessee or lessees should know at least in general outline whether such a lease as they are willing to make would be approved by this court. The issue of the character of the lease that may be made is fairly before us and it ought to be decided now, else the matter is left in such a state of uncertainty in that regard that it may be that none but the boldest or most irresponsible lessee would offer to undertake the blind venture, and that an empty and idle plant would stand as the mournful result of the taxpayers' money that has been spent.

DISSENTING OPINION.

**Anderson, J.**, delivered a dissenting opinion.

In my judgment the majority opinion drives a steam shovel through our Constitution, not only sections 183 and 258 but others to be referred to. It holds that a municipality may either own and operate a garment factory or own and lease it to a private person, association of persons, or a corporation, provided it retains and exercises supervision and control over its operation, which, of course, carries with it the necessary power to fix the wages and hours of labor of the employees. To that extent the right to contract is destroyed. We all agree that ownership and lease by a municipality without supervision and control would violate due process, in that it would result in taxation in aid of a private enterprise and not for a public purpose.

Can the Legislature make a public utility out of a private business? The court knows, as everybody knows,

that according to universal acceptance an industrial plant is a private enterprise and not a public utility. How far can the Legislature go in balancing industry with agriculture for the purpose of relieving unemployment—where is the stopping place? If 10 per cent. of the adult population of the state is unemployed where is the limit? The same question might be asked if 25 per cent. or 50 per cent. were unemployed.

The logic of the majority opinion leads to this: The Legislature, if it found necessary to relieve the unemployment, could authorize a municipality to take over, under the power of eminent domain, all property and all business of every kind within its corporate limits, and to manage and operate it as a public utility. And, of course, what the state could authorize municipalities to do, it could do itself. In other words, the state could take over all property and business of every kind within its boundaries and manage and control it as a public utility. That would indeed be giving Soviet Russia an approving handshake. Mississippi would be safe not for democracy but for communism. The valuable rights of contract and of private ownership of property would be gone. We would have a commonwealth of serfs instead of freemen—parasites instead of patriots. There would be no such thing as taxation for public purposes, for neither the municipalities nor the state could tax their own property. Section 112 of the Constitution, providing for a uniform tax for the support of the government, would be destroyed, and so would section 206 providing for a school fund tax, as well as section 236 providing for a levee tax. The only income would be from rentals and from operation of business. That would certainly be a new definition of democracy.

Going now to sections 183 and 258 of the Constitution: Section 183 provides, among other things, that municipalities shall not subscribe to the ''capital stock of any railroad or other corporation or association, or make

appropriation, or loan its credit in aid of such corporation or association." Section 258 provides that "the credit of the state shall not be pledged or loaned in aid of any person, association, or corporation; and the state shall not become a stockholder in any corporation or association." etc. It will be noted that the word "person" is included in section 258 and omitted from section 183. However, construing the two sections together, it is manifest that section 183 covers persons as well as corporations and associations. Furthermore, without section 183, section 258 would prohibit municipalities and other political subdivisions of the state from doing what the state itself could not do.

Hinds & Adams Counties v. Natchez, Jackson & Columbus R. Co., 85 Miss. 599, 38 So. 189, 107 Am. St. Rep. 305, throws light on what those two sections of the Constitution mean. In the 1870's and 1880's Adams County, Hinds County, and the City of Natchez owned the majority of the stock of the Natchez, Jackson & Columbus Railroad Company and had a majority of the directors of the corporation. The aggregate of their stock was something over $700,000. In several other counties and municipalities of the state like conditions existed. Of course, these railroads were public utilities, and they were, in part at least, under the supervision and control of the public authorities, nevertheless, the result was heavy financial burdens to the counties and municipalities involved, from which they received little, if any, benefit. Some of them are yet levying taxes to meet those railroad ventures. These sections of the Constitution were intended to prevent, among other things, a repetition of that history.

Under the statute here involved, a lease with supervision and control by the municipality would be giving aid to the lessee, even though he paid value therefor, for it is manifest that the lessee would build his own plant if he were able and thought it more profitable to own

than to lease it. In other words, he leases because he thinks it is to his advantage—it is in his aid. Sections 183 and 258 plainly prohibit such aid. They apply to public utilities as well as private business. Neither the state nor any of its political subdivisions can aid a public utility by an appropriation or loan of credit. Jackson Electric Ry. Co. v. Adams, 79 Miss. 408, 30 So. 694, is directly in point. That case was before the court twice, Adams v. Jackson Electric Ry. Co., 78 Miss. 887, 30 So. 58. The case as stated by the reporter and both opinions should be read together. The City of Jackson contracted with a partnership to construct and install in the city an electric light and street railway system. For the faithful performance of the contract, the contractor was required to and did put up a forfeit of $1,500 to insure a compliance with the contract. It failed, and the $1,500 was forfeited to the city and became the city's property exactly like any other money in its treasury. The City of Jackson then contracted with another partnership to complete the system and agreed, if it was done as provided in the contract, in addition to the contract price it would pay a bonus of $1,500, which was designated in the agreement as the $1,500 which had been forfeited by the first contractor. The $1,500 was paid, and the state revenue agent brought suit against the contractor to recover it. The court held that, although the $1,500 was the property of the city and was no different from any other money in its treasury, it was without power, under section 183 of the Constitution, to appropriate any amount out of its treasury in aid of the project. The light and railway system was, of course, a public utility, and under the law could have been owned and operated by the city itself, but it could not lend aid by means of an appropriation of public funds to another ownership. Railroads, of course, are public utilities, and were before the Constitution of 1890 was adopted,

and that is true of municipal light, water, sewerage, and street railway systems.

The majority opinion cites as a precedent the state convict system, which provides for the working of convicts on a farm owned by the state, in competition with the farming interests generally. That is not a precedent, it is expressly authorized by section 225 of the Constitution.

Furthermore, it is a matter of common knowledge that industrial plants like the one here involved are owned and operated by corporations, not individuals or partnerships. Sections 182 and 192 of the Constitution limit the powers of the Legislature with reference to such corporations. The former authorizes an exemption from state taxation for a period of not exceeding five years, and the latter authorizes municipalities to encourage the establishment of factories, gas works, waterworks, and other enterprises of a public utility, other than railroads, within their limits, by exempting them from municipal taxation for ten years. These two sections deal with the subject, and in State v. Henry, 87 Miss. 125, 40 So. 152, 154, 5 L. R. A. (N. S.), 240, the court held that, where the Constitution deals with the subject, its words are the sole boundary "and sacred from the Legislatures;" that where powers are scheduled in the Constitution, giving or taking away, it must be presumed to have scheduled all, and it only must be looked to with its necessary implications for the limit of authority. So it appears plain to me that this scheme is absolutely cut off by our Constitution. This is not a case of stretching the Constitution to meet new conditions, but it is a case of breaking it.